Nos. 23-1590 and 23-1591

IN THE

# United States Court of Appeals
## for the Third Circuit

AL SCHMIDT, in his official capacity as Acting Secretary of the Commonwealth of Pennsylvania, and JONATHAN M. MARKS, in his official capacity as Deputy Secretary for Elections and Commissions

*Defendants-Appellants/Cross-Appellees*,

v.

PUBLIC INTEREST LEGAL FOUNDATION, INC.,

*Plaintiff-Appellee/Cross-Appellant*,

**On Appeal from the United States District Court for the Middle District of Pennsylvania, Case No. 1:19-cv-00622 (Hon. Christopher C. Conner)**

## APPELLEE/CROSS-APPELLANT
## PUBLIC INTEREST LEGAL FOUNDATION'S
## <u>SECOND STEP BRIEF</u>

Noel H. Johnson
Kaylan L. Phillips
Public Interest Legal Foundation, Inc.
107 S. West Street, Ste 700
Alexandria, VA 22314
(703) 745-5870
njohnson@PublicInterestLegal.org
kphillips@PublicInterestLegal.org

Linda A. Kerns, Esquire
LAW OFFICES OF LINDA A. KERNS, LLC
1420 Locust Street – Suite 200
Philadelphia, PA 19102
PA Atty ID 84495
Tel: (215) 731-1400
Fax: (215) 701-4154
linda@lindakernslaw.com

## CORPORATE DISCLOSURE STATEMENT

The Public Interest Legal Foundation is a non-profit, 501(c)(3) organization. It is not a publicly held corporation and no corporation or other publicly held entity owns more than 10% of its stock.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................... 2

STATEMENT OF RELATED CASES ....................................................... 4

STATEMENT OF THE CASE .................................................................... 5

    *Introduction* ........................................................................................ 5

    *Statement of Facts* ............................................................................. 7

    *Procedural History* ......................................................................... 13

STANDARD OF REVIEW ....................................................................... 15

SUMMARY OF THE ARGUMENT ........................................................ 16

ARGUMENT ............................................................................................ 20

    I.    The Foundation Has Standing ....................................................... 20

        A. The Informational Injury Doctrine Applies ............................. 20

        B. *TransUnion LLC v. Ramirez* Did Not Change the
            Informational Injury Doctrine ................................................. 22

        C. The Foundation Has Been Deprived of Information and Suffered
            Adverse Effects Contrary to the Intent of Congress ............... 25

        D. The Foundation Has Standing Under the Fifth Circuit's
            Decision in *Campaign Legal Center. v. Scott* .......................... 30

    II.    The District Court Correctly Held that the Requested Records
        are Within the Public Disclosure Provision's Scope .................... 33

        A. The Commonwealth Has Waived Any Challenge to the District
            Court's Plain-Meaning Analysis .............................................. 34

        B. Neither the Language, Context, nor Intent of the NVRA
            Supports the Commonwealth's View that the Public
            Disclosure Provision is Limited to Records Concerning
            Death and Relocation ............................................................... 35

            i.       The NVRA's Words Unambiguously Encompass the
                   Commonwealth's Activities ........................................... 35

ii.  The District Court Correctly Declined to Read Additional Limitations into the NVRA's Text ................................ 40

iii.  Section 8's Other Provisions Do Not Support the Commonwealth's Narrow Interpretation ...................... 42

iv.  The Commonwealth's Narrow Interpretation Would Frustrate Congress's Intent ............................................ 45

v.  The United States Rejects the Commonwealth's Narrow Interpretation ...................................................... 46

vi.  The Commonwealth's Response to the PennDOT Error Included Statutory Programs .......................................... 48

III.  The District Court Correctly Held that The Commonwealth Must Disclose Records Concerning Registrants Who Did Not Affirm Their Citizenship ........................................................ 49

A.  A Request to Cancel a Registration Record Is Not A "Declination to Register to Vote" under 52 U.S.C. § 20507(i)(1) ................... 50

B.  The District Court Appropriately Balanced the NVRA Public Disclosure Provision with the DPPA ...................................... 53

C.  The Commonwealth's Baseless Speculation Cannot Veto Federal Law .................................................................... 56

D.  Congress Intended for Disclosure of Names and Addresses ... 60

IV.  The District Court Erred When It Held that the Commonwealth's Voter List Maintenance Records Qualify as Attorney Work Product ................................................. 62

A.  The Attorney Work Product Doctrine ..................................... 63

B.  The Commonwealth Was Motivated by the Need to Remedy a Long-Standing List Maintenance Mistake .............. 65

C.  Due to the Passage of Time, the Absence of Litigation, and the Compelling Need for Transparency, the Attorney Work Product Doctrine Should Yield to Congress's Goals in These Circumstances .......................................................... 72

CONCLUSION ............................................................................. 74

# TABLE OF AUTHORITIES

### *Cases*

*Bellitto v. Snipes,*
    No. 16-cv-61474 (S.D. Fla. Mar. 30, 2018)........................... 17, 29, 32, 45

*Blunt v. Lower Merion Sch. Dist.,*
    767 F.3d 247 (3d Cir. 2014)................................................... 24

*Brown v. Socialist Workers '74 Campaign Comm.,*
    459 U.S. 87 (1982)................................................................ 58

*Campaign Legal Center. v. Scott,*
    49 F.4th 931 (5th Cir. 2022) ............................................... 30-33

*Citizens United v. FEC,*
    558 U.S. 310 (2010).............................................................. 58

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992).............................................................. 34-35

*Doe v. Reed,*
    561 U.S. 186 (2010).............................................................. 57

*Doe v. Reed,*
    823 F. Supp. 2d 1195 (W.D. Wash. 2011) ............................ 58

*Encompass Ins. Co. v. Stone Mansion Rest. Inc.,*
    902 F.3d 147 (3d Cir. 2018)................................................. 45

*FDIC v. Deglau,*
    207 F.3d 153 (3d Cir. 2000)................................................. 35

*FEC v. Akins,*
    524 U.S. 11 (1998)................................................................ 21-24

*Fox v. Lackawanna Cty.,*
    No. 3:16-CV-1511 (M.D. Pa. Aug. 27, 2018) ........................ 64

*Graden v. Conexant Sys. Inc.,*
    496 F.3d 291 (3d Cir. 2007)................................................. 34

*Greater Birmingham Ministries v. Secretary of State for the State of Alabama,*
    Case No. 22-13708 (11th Cir.)............................................. 47-48

*Gross v. FBL Fin. Servs.,*
    557 U.S. 167 (2009).............................................................. 34

*Heinzl v. Cracker Barrel Old Country Store, Inc.*,
No. 2:14-cv-1455 (W.D. Pa. Oct. 29, 2015) ................................ 64, 68, 70

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
213 F.3d 124 (3d Cir. 2000) ......................................................... 67, 70-72

*Huber v. Simons Agency, Inc.*,
No. 22-2483 (3d Cir. Oct. 12, 2023) ................................................. 23, 25

*In re Cendant Corp. Sec. Litig.*,
343 F.3d 658 (3d Cir. 2003) .................................................................... 74

*Judicial Watch, Inc. v. King*,
993 F.Supp.2d 919 (S.D. Ind. 2012) ....................................................... 22

*Kelly v. Realpage Inc.*,
47 F.4th 202 (3d Cir. 2022) ................................................... 19, 23-25, 29

*Lamie v. United States Tr.*,
540 U.S. 526 (2004) ................................................................................ 34

*Lujan v. Defs. Of Wildlife*,
504 U.S. 555 (1992) ................................................................................ 24

*Maint. Enters. v. Dyno Nobel, Inc.*,
No. 08-CV-170-B (D. Wyo. Nov. 13, 2009) ........................................... 67

*Martin v. Bally's Park Place Hotel & Casino*,
983 F.2d 1252 (3d Cir.1993) ................................................................... 64

*Mercy Catholic Med. Ctr. v. Thompson*,
380 F.3d 142 (3d Cir. 2004) ................................................................... 42

*Montone v. City of Jersey City*,
709 F.3d 181 (3d Cir. 2013) ................................................................... 15

*Morton v. Mancari*,
417 U.S. 535 (1974) .......................................................................... 53, 56

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958) ............................................................................57-58

*Pa. Coal Ass'n v. Babbitt*,
63 F.3d 231 (3d Cir. 1995) ..................................................................... 15

*Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*,
507 U.S. 380 (1993) ................................................................................ 34

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ................................16, 18, 29, 38-40, 56, 60

*Project Vote/Voting for Am., Inc. v. Long*,
  752 F. Supp. 2d 697 (E.D. Va. 2010) ...................................................... 21

*Protectmarriage.com v. Bowen*,
  830 F. Supp. 2d 914 (E.D. Cal. 2011) ......................................................58

*Public Citizen v. United States Department of Justice*,
  491 U.S. 440 (1989)........................................................................20-24, 26

*Public Interest Legal Foundation v. Bellows*,
  Case No. 23-1361 (1st Cir.) ..............................................................47-48

*Pub. Interest Legal Found. v. Bennett*,
  No. H-18-0981 (S.D. Tex. Feb. 6, 2019) ....................................22, 39 n.8

*Pub. Interest Legal Found., Inc. v. Bennett*,
  No. 4:18-CV-00981 (S.D. Tex. Mar. 11, 2019) ...................................... 22

*Pub. Int. Legal Found. v. Boockvar*,
  370 F. Supp. 3d 449 (M.D. Pa. 2019)...............................4, 13, 28, 28 n.6

*Public Interest Legal Foundation v. Boockvar*,
  No. 1:20-cv-1905 (M.D. Pa., filed Oct. 15, 2020)..................................... 8

*Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) .................................................33, 39, 59-60

*Public Interest Legal Foundation v. Torres*,
  No. 1:18-cv-00463 (M.D. Pa., filed Feb. 2, 2018) ................................. 13

*Public Interest Legal Foundation v. Voye*,
  No. 2:20-cv-00279 (W.D. Pa., filed Feb. 24, 2020) ................................. 8

*Russello v. United States*,
  464 U.S. 16 (1983)............................................................................ 36, 51

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)................................................................................ 24

*Smithkline Beecham Corp. v. Apotex Corp.*,
  193 F.R.D. 530 (N.D. Ill. 2000)............................................................... 67

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021)....................................................19, 22-24, 31, 33

*True the Vote v. Hosemann*,
   43 F. Supp. 3d 693 (S.D. Miss. 2014) ..................................................... 45

*United States v. Ernstoff*,
   183 F.R.D. 148 (D.N.J. 1998) ...................................................... 64, 69

*United States v. Gonzales*,
   520 U.S. 1 (1997) ................................................................. 33

*United States v. Joseph*,
   730 F.3d 336 (3d Cir. 2013) .................................................... 50

*United States v. Moreno*,
   727 F.3d 255 (3d Cir. 2013) .................................................... 33

*United States v. Rockwell Int'l*,
   897 F.2d 1255 (3d Cir. 1990) ........................................... 64, 70, 72

*Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*,
   390 U.S. 261 (1968) ............................................................. 41

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ............................................................. 16

**Statutes and Rules**

Fed. R. Civ. P. 26(b)(3)(A) ......................................................... 63

18 U.S.C. § 2721(a)(1) .............................................................. 53

18 U.S.C. § 2725(3) ................................................................. 53

52 U.S.C. § 20501(b)(1)-(4) ......................................................... 5

52 U.S.C. § 20501(b)(3)-(4) ..................................................... 28, 45

52 U.S.C. § 20504(c)(2)(D)(ii) ...................................................... 52

52 U.S.C. § 20506(a)(6)(B) .......................................................... 52

52 U.S.C. § 20507(a)(3)(A) ...................................................... 49, 51

52 U.S.C. § 20507(a)(4) ............................................................. 42

52 U.S.C. § 20507(d)(1)-(2) ......................................................... 61

52 U.S.C. § 20507(i)(1) ........................................................ *passim*

52 U.S.C. § 20507(i)(2) ......................................................... 44, 61

52 U.S.C. § 20508(b)(4)(ii) ......................................................... 52

vii

52 U.S.C. § 20510(b) ......................................................... 1

25 Pa.C.S. § 1301(a)-(b) ................................................. 39

25 Pa.C.S. § 1323(a)(1) ................................................... 49

25 Pa.C.S. § 1901(a)(1) ................................................... 49

28 U.S.C. § 1331 ............................................................... 1

28 U.S.C. § 1291 ............................................................... 1

## Other Sources

FEC, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* ......................................................... 41 n.9

Pennsylvania Department of State, *Administration of Voter Registration in Pennsylvania: 2022 Annual Report to the Pennsylvania General Assembly*, June 30, 2023 ................................................................................. 30 n.7

https://publicinterestlegal.org/contact/ ....................................................... 7 n.2

Public Interest Legal Foundation, *Steeling The Vote: Allegheny County Reveals How Citizenship Verification Protects Citizens and Immigrants Alike*, July 12, 2018 ................................................................................. 27 n.5

# **JURISDICTIONAL STATEMENT**

Plaintiff-Appellee/Cross-Appellant Public Interest Legal Foundation ("Foundation") brought a one-count complaint alleging a violation of Section (8)(i) of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1). ECF 1.[1] The district court had jurisdiction pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States, and 52 U.S.C. § 20510(b), because the action seeks declaratory and injunctive relief under the NVRA. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] District Court docket numbers are preceded by "ECF."

1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    **Whether the District Court correctly held that the Foundation has standing.**

The Commonwealth contested the Foundation's standing in the District Court. *See* ECF 14 at 14-16. The District Court held that the Foundation has standing. *See* Appx020.

2.    **Whether the District Court correctly held that the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1), is not limited to records concerning registrant death or changes in residence, but covers all voter list maintenance records, including records concerning eligibility evaluations based on citizenship.**

The Commonwealth contested the NVRA's scope in the District Court. *See* ECF 14 at 6-11. The District Court rejected the Commonwealth's arguments. *See* Appx007-014.

3.    **Whether the District Court correctly determined that the Commonwealth's voter list maintenance activities were motivated solely by an objectively reasonable anticipation of litigation, as required to invoke the attorney work product doctrine.**

2

The Foundation raised and contested this issue in the District Court. *See*
ECF 67 at 18-23; ECF 71 at 8-12; ECF 75 at 8-12. The District Court ruled on this
issue in its summary judgment memorandum. *See* Appx038-043.

## <u>STATEMENT OF RELATED CASES</u>

This case has not been before this Court previously.

The Foundation filed an identical action prior to this action, which was dismissed. *See Pub. Int. Legal Found. v. Boockvar*, 370 F. Supp. 3d 449 (M.D. Pa. 2019).

The Foundation is not aware of any other case related to this action.

# STATEMENT OF THE CASE

*Introduction*

With the NVRA, Congress intended to increase and enhance registration and voting by "eligible citizens," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1)-(4). To accomplish these goals, Congress created the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1), a broad and powerful federal open records law, and a private right of action, 52 U.S.C. 20510(b). These two components serve vital oversight and enforcement functions, which ultimately promote *all* the NVRA's purposes. In short, Congress intended maintenance of state voter rolls to be transparent, because oversight and accountability safeguard the right to vote.

The NVRA's Public Disclosure Provision requires public disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). As a threshold question, this case asks whether Congress meant what it said. Consistent with the overwhelming weight of authority, the District Court answered that question "yes," finding that the Public Disclosure Provision "contemplates an *indefinite* number of programs *and*

5

activities," Appx012 (emphasis in original), including the Commonwealth's "effort to identify noncitizen registrants," Appx014. The District Court's holding should be affirmed because it was compelled by the NVRA's plain language and comports with Congress's intent. In the simplest terms, the Secretary engaged in "programs and activities" designed to make the Commonwealth's voter roll more accurate. Records concerning those activities thus fall squarely within the Public Disclosure Provision's unambiguous and broad scope.

Congress specifically identified the two types of records that are not open to inspection, 52 U.S.C. § 20507(i)(1), and the District Court correctly declined to "read unexpressed limitations into an unambiguous statute's terms," Appx011. With rare exceptions, largely not applicable here, "the balance between privacy and transparency must be struck by the legislature, not the courts." Appx037. Where appropriate, the District Court applied the Driver's Privacy Protection Act according to its text, so that the NVRA and the DPPA both remain effective. The Commonwealth offers no compelling reason to disturb the District Court's reasoned judgment.

This case also asks whether election officials may veto Congress's transparency goals by abdicating voter list maintenance decisions to outside legal counsel. Here, the Commonwealth seeks to hide its mistakes behind the attorney

work product privilege, by simply claiming its actions were motivated by an

abstract fear of litigation—rather than the manifest need to remedy a decades-long

problem that allowed foreign nationals to register and vote. The answer to these

questions will impact the state of election transparency here and in election offices

throughout the country.

***Statement of Facts***

1.     The Foundation is a non-partisan, public interest organization that was

headquartered in Indianapolis, Indiana when this action was filed.[2] The Foundation

promotes the integrity of elections nationwide as part of its mission. Appx025;

ECF 67-1 ¶ 3. The Foundation does this, in part, by using state and federal open

records laws (*e.g.*, the NVRA Public Disclosure Provision) to study and analyze

the voter list maintenance activities of state and local governments. ECF 67-1 ¶ 3.

Where necessary, the Foundation also takes legal action to compel compliance

with state and federal voter list maintenance laws. *Id*. The Foundation has

dedicated significant time and resources to ensure that voter rolls in the

Commonwealth of Pennsylvania, and other jurisdictions throughout the United

States, are free from ineligible registrants, including deceased individuals, foreign

---

[2] The Foundation has since moved its headquarters to Alexandria, Virginia. *See* https://publicinterestlegal.org/contact/ (last accessed Oct. 26, 2023).

nationals, individuals who are no longer residents, and individuals who are simultaneously registered in more than one jurisdiction. *Id*.

2.    The Foundation has filed multiple lawsuits in the Commonwealth of Pennsylvania concerning voter list maintenance. *See, e.g., Public Interest Legal Foundation v. Boockvar*, Civ. No. 1:20-cv-1905 (M.D. Pa., filed Oct. 15, 2020) and *Public Interest Legal Foundation v. Voye*, Civ. No. 2:20-cv-00279 (W.D. Pa., filed Feb. 24, 2020). ECF 67-1 ¶ 3.

3.    In late 2017, the Commonwealth publicly admitted that non-United States citizens had registered to vote at Pennsylvania Department of Motor Vehicle offices ("PennDOT") for the last several decades (hereafter, the "PennDOT Error")[3]. Appx025; ECF 66 ¶ 6.

4.    The Commonwealth acknowledged the PennDOT Error in written and oral testimony before the Pennsylvania General Assembly. Appx025; ECF 66 ¶ 6.

---

[3] The Commonwealth describes the cause of noncitizen registration as a "software error." Doc. 25 at 4. The term "software error" suggests that PennDOT's registration software did not function correctly or as designed. That is not the case here. The software functioned exactly as designed. If there was any "error" involved, it was an error in judgment—namely, the decision to offer the opportunity to register to vote to applicants *before* verifying each applicant's citizenship. *See* ECF 66-2 at 2. The Foundation uses the term "PennDOT Error" in this brief to refer to the subject of noncitizen registration at PennDOT offices.

5.      The Commonwealth engaged in a three-stage remedial program in response to the PennDOT Error.

6.      The first stage—referred to by the District Court as the "Initial Analysis"—began in September 2017. Appx026; ECF 66 ¶¶ 47-49. During the Initial Analysis, the Commonwealth collaborated with PennDOT to compare voter registration records with PennDOT records containing INS indicators, which signify "that the license holder was, at some point in their life, something other than a United States citizen." Appx027; *see also* ECF 66 ¶¶ 49-50. The Initial Analysis "identified approximately 100,000 registered voters 'who may potentially be non-citizens or may have been non-citizens at some point in time.'" Appx027 (quoting ECF 64-1 ¶ 13; ECF 66 ¶ 51); *see also* ECF 66 ¶ 51.

7.      The second stage—referred to by the District Court as the "Statewide Analysis"—also began in or around September 2017. Appx027; ECF 66 ¶ 55. During the Statewide Analysis, the Commonwealth searched the statewide voter registration database (formally known as the SURE[4] database) "for records related to any voter registrations cancelled by a county simply because the registrant was not a citizen[.]" Appx027; *see also* ECF 66 ¶ 55.

The [S]tatewide [A]nalysis produced voting registration records for 1,160 individuals. (*See* [ECF 66] ¶¶ 55, 59). However, the 1,160

---

[4] SURE means Statewide Uniform Registry of Electors.

> records reflected only those registrants who self-reported their status as noncitizens and voluntarily requested their voter registration be cancelled. (See id. ¶ 58). Of the 1,160 noncitizen registrants, 248 voted in at least one election prior to cancelling their registration. (See id. ¶¶ 60-61).

Appx027; ECF 66 ¶¶ 55, 58, 61. "In conjunction with the [S]tatewide [A]nalysis, the Commonwealth asked counties to provide copies of any cancellation requests received by the county from noncitizens seeking to cancel their voter registration." Appx027 (citing ECF 64-1 ¶ 11). However, "[o]nly Allegheny, Philadelphia, and Dauphin Counties provided records in response to the request." *Id.*

8.    The third stage—referred to by the District Court as the "Noncitizen Matching Analysis"—began after the Statewide Analysis. Appx028.

9.    During the Noncitizen Matching Analysis, the Commonwealth "engaged with an expert to do an analysis of voter registration records and motor vehicle records to determine the, the [sic] universe of potential individuals that required more – had more scrutiny in terms of their, their qualifications specifically related to citizenship[.]" ECF 66 ¶ 62; *see also* Appx028 ("The expert analyzed the Commonwealth's voting records, including the SURE database, to identify registrants whose eligibility to vote required additional scrutiny in terms of citizenship.").

10

10.    The Commonwealth explained and summarized the Noncitizen Matching Analysis in a July 2018 statement prepared by its communications office entitled "Voter Registration & Election Integrity" (hereafter, the "Expert Analysis Statement"). ECF 66 ¶ 63.

11.    The Expert Analysis Statement provides, in part:

> The Department also undertook the following steps to investigate and address the concern that some ineligible individuals registered to vote:
>
> - The Department retained an expert to conduct a full analysis of registration data by comparing the voter rolls with other available state databases. The initial analysis yielded a responsible list of individuals for whom voter registration status required further confirmation.
>
> - Prior to the May 2018 primary, the department mailed letters to 7,702 of those registrants whose registration status was active. Because the data analysis was ongoing, the immediate goal was to remind the individuals of voter eligibility requirements before the primary.
>
> - Based on further expert analysis, the Department mailed letters to 11,198 registrants on June 12, including those with active and inactive status, asking the recipients to affirm their eligibility to vote or to submit a request to cancel their registration.
>
> - After the responsive affirmations and requests for cancellation were taken into account, on June 29 another round of letters with a similar message was mailed to those who had not responded.

ECF 66 ¶ 64.

12.    The 7,702 registrants who received the letter referenced in bullet point 2 of paragraph 11 "required additional scrutiny regarding their qualifications" to register to vote. ECF 66 ¶ 66. Each of these registrants received a letter "reminding them of the eligibility requirements for voting." Appx028.

13.     The 7,702 registrants who received the letter referenced in bullet point 2 of paragraph 11 were separate from the 1,160 voter registration records analyzed in the Statewide Analysis. ECF 66 ¶ 67.

14.     The 11,198 registrants referenced in bullet point 3 of paragraph 11 received a letter asking them to affirm or cancel their registration (hereafter, the "Affirm or Cancel Letter"). ECF 66 ¶ 68; Appx028; *see also* ECF 66-11.

15.     The Commonwealth kept a list of responses to the Affirm or Cancel Letter. ECF 66 ¶ 69; *see also* Appx028.

16.     Of the recipients of the Affirm or Cancel Letter, 1,915 mailed back the Letter to the Department of State with an affirmative response indicating they were citizens and qualified to be registered. ECF 66 ¶ 70.

17.     Of the recipients of the Affirm or Cancel letter, 215 mailed back to county offices requesting cancellation of their voter registration record. ECF 66 ¶ 72.

18.     Of the recipients of the Affirm or Cancel letter, 8,698 either did not respond or had undeliverable addresses. ECF 66 ¶ 73. The Commonwealth has not provided all records concerning these letter recipients. *See, e.g.*, Doc. 25 at 14-15.

19.     The Department of State provided information on those 8,698 letter recipients to county offices with instructions to "handle the registrants according to

their normal processes employed to verify addresses and confirm eligibility." ECF 66 ¶ 74.

20.    In October 2017, pursuant to NVRA's Public Disclosure Provision, the Foundation requested from the Commonwealth four (4) categories of records. *See* Appx028-029; ECF 66 ¶ 9.

21.    The Commonwealth denied the Foundation's request. Appx030; ECF 66 ¶¶ 17, 21.

### *Procedural History*

The Foundation requested the Commonwealth's records more than six years ago, on October 23, 2017. *See* ECF 1-9. The Secretary denied the request, and on February 26, 2018, the Foundation filed an action to enforce the NVRA, alleging that the Secretary violated the NVRA by denying the Foundation access to the requested records. ECF 1, *Public Interest Legal Foundation v. Torres*, No. 1:18-cv-00463 (M.D. Pa., filed Feb. 2, 2018). That action was dismissed for failure to provide proper notice under the NVRA. *Boockvar*, 370 F. Supp. 3d at 458.

The Foundation cured the statutory notice deficiency and filed the present action on April 10, 2019. ECF 1. On December 12, 2019, the District Court granted in part and denied in part the Secretary's motion to dismiss. Appx022-023.

13

On March 31, 2022, the District Court granted in part and denied in part both parties' motions for summary judgment. Appx050-051. In an order dated February 27, 2023, upon Motion of the Commonwealth, the District Court clarified its judgment, but denied the Secretary's motions for reconsideration and to amend or alter the judgment. Appx053-058.

The Secretary filed a notice of appeal on March 29, 2023. Appx059. The Foundation filed a notice of cross appeal on March 30, 2023. Appx061.

## **STANDARD OF REVIEW**

This Court "employ[s] a *de novo* standard of review to grants of summary judgment, 'applying the same standard as the District Court.'" *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013) (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)).

## SUMMARY OF THE ARGUMENT

Thirty years ago, Congress decided that decisions about who is and is not eligible to vote should be transparent and publicly accessible. That decision is embodied in the NVRA's Public Disclosure Provision, which mandates that "all records" related to the implementation of voter list maintenance activities are subject to public inspection. 52 U.S.C. § 20507(i)(1).

The NVRA's Public Disclosure Provision is no ordinary transparency law. Its unique and expansive scope is deliberate because it is designed to protect the right that is "preservative of all rights"—the right to vote. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The Public Disclosure Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012) ("*Project Vote*"). To that end, Congress designed the Public Disclosure Provision to shed light on *all* activities that determine who belongs and who does not belong on the voter rolls. As one federal district court put it, the Public Disclosure Provision "convey[s] Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs. Accordingly, election

16

officials must provide full public access to all records related to their list maintenance activities, including their voter rolls." *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *12-13 (S.D. Fla. Mar. 30, 2018).

The Commonwealth seeks reversal upon an incorrect interpretation of the NVRA that strays far from the plain-meaning analysis this Court must conduct. The Commonwealth's view finds no support in the NVRA's text or in any court opinion to date. It is also contrary to the United States's interpretation.

The NVRA's Public Disclosure Provision unambiguously requires public inspection of "all records concerning the implementation" of voter list maintenance activities. 52 U.S.C. § 20507(i)(1). Congress identified the records that are exempt from this disclosure mandate, *id.*, and beyond those records, Congress made no exceptions. Records concerning the Commonwealth's efforts to identify registrants who may lack citizenship fall within the NVRA's scope because those records "concern[]" activities that were conducted to maintain an accurate voter roll. The District Court did not err when it so concluded.

The Commonwealth's interpretation would cause absurd and damaging results, chief among them the concealment of records showing who is and who is not eligible to vote and how government officials make eligibility determinations. Such an outcome would erode transparency and undermine the NVRA's purposes,

because "[w]ithout such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339. Congress did not limit the NVRA's sweeping inspection provision to a subset of activities, as the Commonwealth claims. Instead, Congress drafted the NVRA broadly, and that choice has enormous significance and must be given effect, as it has by other courts.

The District Court correctly applied the plain language of the Driver's Privacy Protection Act ("DPPA") to find that DPPA shields only personal information derived exclusively from DMV records. Appx036-037. In other words, the DPPA "does not protect information derived from non-DMV sources even when that information is included in a record containing personal information obtained from DMV records." *Id*. To find otherwise, as the Commonwealth urges, would expand the DPPA beyond its text, elevate one law over another, and result in the concealment of records showing why a registrant lost her right to vote or was not eligible in the first place.

The District Court did not, however, correctly apply the attorney work product doctrine to the facts of this case. The Noncitizen Matching Analysis was not the product of the Commonwealth's objectively reasonable anticipation of litigation. Rather, it was the final step of a multi-stage investigation into a decades-

18

old failure in conducting ordinary list maintenance. The Commonwealth knew of the problem as early as 2015 and openly acknowledged its efforts to find and implement a remedy. It defies logic—and the record—to conclude that the last stage of the Commonwealth's remedial plan—and only that stage—had no other purpose than litigation readiness, especially when the analysis had a clearly identifiable goal: identifying who should receive an eligibility letter. What is logical, and what is supported by the record, is this: the Secretary's actions would have taken place whether or not litigation was expected to ensue. The work product doctrine therefore does not apply.

Last, the Commonwealth's standing arguments are meritless. This Circuit has already addressed the impact of *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) and found that "the [Supreme] Court did not amend the informational injury doctrine in *TransUnion*; rather, it simply applied its prior precedent[.]" *Kelly v. Realpage Inc.*, 47 F.4th 202, 213 (3d Cir. 2022). In any event, the Foundation has standing because it has demonstrated an informational injury and the adverse effects of that injury—namely, the inability to evaluate and scrutinize the Secretary's voter list maintenance activities and the inability to educate the public and election officials about same.  Congress sought to promote precisely these types of activities when it passed the NVRA Public Disclosure Provision.

19

## **ARGUMENT**

### I.     **The Foundation Has Standing.**

The District Court correctly held that the Foundation has standing because the Foundation suffered an informational injury that caused downstream consequences—namely, the inability to do the very things Congress envisioned when it crafted the NVRA Public Disclosure Provision. The Commonwealth's arguments to the contrary misconstrue precedent and rely on the mistaken belief that the informational injury doctrine has changed. It has not. If the Commonwealth's erroneous view of standing is adopted, not even the Press will have standing to gather information about the most egregious voter list maintenance errors. This Court should decline the Commonwealth's invitation to dismantle a vital oversight mechanism designed to safeguard the right to vote.

#### **A. The Informational Injury Doctrine Applies.**

The Informational Injury Doctrine is decades old. In *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 449 (1989), the Supreme Court explained that to establish standing in public-records cases, the plaintiff does not "need [to] show more than that they sought and were denied specific agency records." There, the plaintiff sought records pursuant to the Federal Advisory Committee Act ("FACA"). The Supreme Court held that FACA created a public

right to information by requiring advisory committees to the executive branch of

the federal government to make available to the public its minutes and records,

with some exceptions. 491 U.S. at 446-47. The defendant asserted that the plaintiff

did not "allege[] [an] injury sufficiently concrete and specific to confer standing."

*Id*. at 448. The Supreme Court "reject[ed] these arguments." *Id*. at 449.

> As when an agency denies requests for information under the Freedom
> of Information Act, refusal to permit appellants to scrutinize the ABA
> Committee's activities to the extent FACA allows constitutes a
> sufficiently distinct injury to provide standing to sue.

*Id*. In other words, the inability to "scrutinize" the activities of government

"constitutes a sufficiently distinct injury." *Id*. The Court reaffirmed the holding of

*Public Citizen* in *FEC v. Akins*, 524 U.S. 11 (1998), explaining, "a plaintiff suffers

an 'injury in fact' when the plaintiff fails to obtain information which must be

publicly disclosed pursuant to a statute." *Id*. at 21.

Citing *Public Citizen* and *Akins*, the Eastern District of Virginia rejected a

similar attack on standing under the NVRA, explaining that "[f]or a plaintiff to

sufficiently allege an informational injury, it must first allege that the statute

confers upon it an individual right to information, and then that the defendant

caused a concrete injury to the plaintiff in violation of that right." *Project

Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 702 (E.D. Va. 2010). The

court first recognized that "the NVRA provides a public right to information." *Id*.

21

at 703. Where there is "no dispute that the plaintiff has been unable to obtain the [r]equested [r]ecords," "the plaintiff's alleged informational injury is sufficient to survive a motion to dismiss for lack of standing." *Id*. at 703-04.

For similar reasons, the Southern District of Texas ruled that the Foundation had standing to compel citizenship-related list maintenance records under the NVRA. *Pub. Interest Legal Found. v. Bennett*, No. H-18-0981, 2019 U.S. Dist. LEXIS 39723, at *8-*10 (S.D. Tex., Feb. 6, 2019) (denying motion to dismiss), *adopted by Pub. Interest Legal Found., Inc. v. Bennett*, No. 4:18-CV-00981, 2019 U.S. Dist. LEXIS 38686 (S.D. Tex., Mar. 11, 2019). The Southern District of Indiana accords. *See Judicial Watch, Inc. v. King*, 993 F.Supp.2d 919, 923 (S.D. Ind. 2012) (citing *Akins*, 524 U.S. at 24-25) ("As noted above, the Plaintiffs assert two distinct violations of the NVRA. With regard to the Records Claim, the Defendants do not—and cannot—assert that the Plaintiffs lack standing.").

## B. *TransUnion LLC v. Ramirez* Did Not Change the Informational Injury Doctrine.

The Commonwealth suggests that in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the Supreme Court revised the Informational Injury Doctrine to require more from plaintiffs than what was required under *Public Citizens* and *Akins*. (Doc. 25 at 26.) Not so. This Circuit has already addressed the impact of *TransUnion* and found that "the [Supreme] Court did not amend the informational

injury doctrine in *TransUnion*; rather, it simply applied its prior precedent[.]" *Kelly v. Realpage Inc.*, 47 F.4th 202, 213 (3d Cir. 2022). By "prior precedent," the Third Circuit was referring to *Public Citizens* and *Akins*, as well as *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). "*TransUnion* did not cast doubt on the broader import of those decisions. In fact, the Court cited *Public Citizen* and *Akins* with approval, reaffirming their continued viability and putting *TransUnion* in context." *Realpage Inc.*, 47 F.4th at 212. The Third Circuit confirmed this view just weeks ago in *Huber v. Simons Agency, Inc.*, No. 22-2483, 2023 U.S. App. LEXIS 27069, at *12 (3d Cir. Oct. 12, 2023), in which the Court explains, "In short, entitlement to the information allegedly withheld is the *sine qua non* of the informational injury doctrine."

The Informational Injury Doctrine thus remains the same after *TransUnion*.

> [T]o state a cognizable informational injury a plaintiff must allege that "they failed to receive … required information," and that the omission led to "adverse effects" or other "downstream consequences," *TransUnion*, 141 S. Ct. at 2214 (internal quotation omitted), and such consequences have a nexus to the interest Congress sought to protect, *Spokeo*, 578 U.S. at 342.

*Realpage Inc.*, 47 F.4th at 214.

This issue warrants a few more points of clarification. First, the Commonwealth is flat wrong when it states the District Court issued its decision on standing "without the benefit of *TransUnion*." (Doc. 25 at 17.) *TransUnion* was

23

decided on June 25, 2021. The District Court issued its summary judgment order more than *nine months later*, on March 31, 2022. Appx050. In fact, *TransUnion* was decided before the Commonwealth filed its summary judgment reply memorandum. *See* ECF 74 (filed June 28, 2021). The Commonwealth then had more than nine months to file a notice of supplemental authority to notify the District Court about *TransUnion*. The Commonwealth chose not to. None of this ultimately matters because *TransUnion* did not change the standard articulated in *Public Citizen* and *Akins*, *see Realpage Inc.*, 47 F.4th at 213, the decisions on which the District Court decided the standing question.

Second, the Commonwealth is wrong again when it suggests that any alleged "adverse effects" and "downstream consequences" must *independently* satisfy the Article III standard. Doc. 25 at 21-24. If that were the case, the Supreme Court would have simply required plaintiffs to plead a deprivation of information and a separate "injury in fact." The Supreme Court does not require a separate and independent Article III "injury in fact" to establish a cognizable informational injury. The Court simply requires "(1) the denial of information and (2) *some consequence* caused by that omission." *Realpage Inc.*, 47 F.4th at 213 (emphasis added). *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992), *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972), and *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d

24

247, 288 (3d Cir. 2014) are not informational injury cases, and the

Commonwealth's reliance on them is therefore misplaced.

*Huber* confirms that the Informational Injury Doctrine is a separate inquiry

from traditional standing analysis. 2023 U.S. App. LEXIS 27069, at *9-*23

(finding that the plaintiff did not have standing under the Information Injury

Doctrine but did have standing under traditional standing principles). The Third

Circuit explained that in *Realpage Inc.*, the Court "deemed [the Informational

Injury] doctrine an exception to the usual concreteness requirement that a plaintiff

identify a close historical or common-law analogue to her cause of action." *Id*. at

*12 (citing *Realpage Inc.*, 47 F.3d at 212 n.8).

### C. The Foundation Has Been Deprived of Information and Suffered Adverse Effects Contrary to the Intent of Congress.

To have standing, the Foundation must show (1) it failed to receive required

information; (2) it suffered "adverse effects" or other "downstream consequences";

and, (3) such consequences have a nexus to the interest Congress sought to protect.

*Realpage Inc.*, 47 F.4th at 214.

**First**, the Commonwealth does not dispute that the Foundation requested

information pursuant to the NVRA and did not receive that information. Indeed,

the Commonwealth's appeal continues to prevent the Foundation from receiving

25

the voter list maintenance records requested many years ago, which the District Court ordered the Commonwealth to produce.

**Second**, the Foundation has suffered three primary "adverse effects" or "downstream consequences" resulting from the Commonwealth's refusal to provide the required information. First, the Foundation cannot "study and analyze the [Commonwealth's] voter list maintenance activities," ECF 66 ¶ 3, because the Commonwealth failed to provide those voter list maintenance records. The Commonwealth's denial of the Foundation's request is a "refusal to permit [the Foundation] to scrutinize the [Commonwealth's] activities to the extent [NVRA] allows." *Public Citizen*, 491 U.S. at 499. The NVRA Public Disclosure Provision was designed to allow scrutiny of voter list maintenance activities, and therefore denying the Foundation the ability to "scrutinize" those activities in the Commonwealth "constitutes a sufficiently distinct injury to provide standing to sue." *Id*.

Because it cannot effectively analyze and scrutinize the Commonwealth's activities, the Foundation also cannot effectively "take action to promote election integrity and compliance with federal and state statutes," including voter list maintenance statutes. *Id*. ("Where necessary, the Foundation also takes legal action to compel compliance with state and federal voter list maintenance laws."); *see*

*also* ECF 1 ¶ 135 ("A central activity of the Foundation is to promote election

integrity and compliance with federal and state statutes which promote the integrity

of elections."). <u>Second</u>, the Commonwealth's actions frustrate the educational

aspect of the Foundation's mission. The Foundation regularly produces and

disseminates educational materials concerning the accuracy of voter registration

records and the adequacy of voter list maintenance programs, including "the

inadequacies of state election systems in preventing noncitizens from registering

and voting." ECF 1 ¶ 134. "Using records and data compiled through use of the

NVRA's public inspection provision, the Foundation has produced written reports

concerning the registration and voting activity of noncitizens." ECF 1 ¶ 133. For

example, the Foundation published a report focused on noncitizen registration and

voting in Allegheny County, Pennsylvania,[5] which was made possible only

because Allegheny County complied with the NVRA. <u>Third</u>, the Foundation

expended considerable time and financial resources attempting to obtain the

---

[5] Public Interest Legal Foundation, *Steeling The Vote: Allegheny County Reveals How Citizenship Verification Protects Citizens and Immigrants Alike*, July 12, 2018, available at https://publicinterestlegal.org/pilf-files/Steeling-the-Vote-7.11.18.pdf (last accessed Oct. 27, 2023).

requested records so that it could engage in the activities just described. *See Boockvar*, 370 F. Supp. 3d at 456.[6]

The Commonwealth does not dispute *any* of the facts concerning the Foundation's mission, the Foundation's intended activities, the Foundation's inability to engage in those activities, or the resources the Foundation expended attempting to obtain the requested records. In other words, these facts were and are undisputed for purposes of the District Court's summary judgment ruling.

**Third**, the adverse effects described above have a strong nexus to the exact interests Congress sought to protect. Congress told us exactly what interests the NVRA was designed to protect. As the District Court recognized, "Congress identified several purposes of the NVRA within the statute itself. These include, *inter alia*, 'to protect the integrity of the electoral process' and 'to ensure that accurate and current voter registration rolls are maintained.'" *Boockvar*, 370 F. Supp. 3d at 455 (quoting 52 U.S.C. § 20501(b)(3)-(4)). The NVRA's Public Disclosure Provision furthers Congress's purposes by allowing the public to monitor, analyze, assess, and critique the work of election officials. Transparency fosters accountability.

---

[6] The District Court correctly rejected the argument—repeated here, Doc. 25 at 22-23—that the resources the Foundation expended in pursuit of the requested records were litigation expenses. *Boockvar*, 370 F. Supp. 3d at 456 n.4.

28

In the words of another federal court, the NVRA's Public Disclosure

Provision is "available to any member of the public … and convey[s] Congress's

intention that the public should be monitoring the state of the voter rolls and the

adequacy of election officials' list maintenance programs." *Bellitto*, 2018 U.S.

Dist. LEXIS 103617, at *12-13. Indeed, Congress made all list maintenance

records subject to public inspection precisely so that the public can enjoy a

transparent election process and assess compliance with federal laws. "Public

disclosure promotes transparency in the voting process, and courts should be loath

to reject a legislative effort so germane to the integrity of federal elections."

*Project Vote*, 682 F.3d at 339-40.

The Foundation's intended activities—namely, analysis, education, and

remedial action concerning voter list maintenance—are precisely the activities

Congress envisioned when it passed the Public Disclosure Provision. There is a

nexus between the adverse effects the Foundation faces and the interests Congress

sought to protect via the NVRA. *See Realpage Inc.*, 47 F.4th at 214.

The Commonwealth's narrow view of standing under the NVRA effectively

dismantles Congress's design for the Public Disclosure Provision. Consider the

following: the Commonwealth reported that in 2022 it cancelled more than

185,000 inactive voter registration records pursuant to what the Commonwealth

29

calls its "Voter Removal Program."[7] Imagine the Philadelphia Inquirer wanted to investigate those removals to determine whether they were lawful. According to the Commonwealth, it could deny the Inquirer's request and the Inquirer would not have standing to contest the denial in federal court. Congress did not intend such a result. Congress intended effective and robust oversight of the sort that the Inquirer and other media provide.

It is no less absurd for the Commonwealth to argue that the Foundation—a public interest organization dedicated to studying and improving voter list maintenance activities—does not have standing to compel production of voter list maintenance records under a federal law designed to make voter list maintenance transparent. The Commonwealth's view of standing under the NVRA is contrary to the intent of Congress and would thwart rather than promote the NVRA's goals.

### D. The Foundation Has Standing Under the Fifth Circuit's Decision in *Campaign Legal Center. v. Scott.*

The "downstream consequences" the Foundation has demonstrated distinguish it from the plaintiffs in *Campaign Legal Center. v. Scott*, 49 F.4th 931

---

[7] Pennsylvania Department of State, Administration of Voter Registration in Pennsylvania: 2022 Annual Report to the Pennsylvania General Assembly, June 30, 2023, *available at* https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/Annual%20Reports%20on%20Voter%20Registration/DOS_Voter_Registration_Report_2022_FINAL.pdf (last accessed Oct. 27, 2023).

(5th Cir. 2022). *Scott* likewise arose from a records request under NVRA's Public Disclosure Provision. *Id.* at 933. The plaintiffs sought "information including the names and voter identification numbers of persons suspected of being noncitizens though registered to vote." *Id.* at 932. Plaintiffs "obtained an injunction from the district court requiring the State of Texas to provide [this] information." *Id.*

On appeal, the Fifth Circuit reversed and remanded with instructions to dismiss, holding that the plaintiffs did not adequately allege an injury sufficient to establish standing. *Id.* at 939. The Fifth Circuit interpreted the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) to mean that "even in public disclosure-based cases, plaintiffs must and can assert 'downstream consequences,' which is another way of identifying concrete harm from governmental failures to disclose." *Scott*, 49 F.4th at 938. Plaintiffs failed to meet this standard because they made only a "freestanding informational injury claim" that "lack[ed] downstream consequences." *Id.* 938-39.

The Court explained:

On appeal, Plaintiffs attempt to establish standing by asserting three theories of informational injury standing. First, Plaintiffs contend that as "civic engagement organizations . . . [they] have standing to request records under the NVRA[]" and therefore have a right to the requested registrant records. Second, they maintain that "there is [a] downstream injury with respect to the public not having visibility into how Texas is keeping its voter lists[.]" Third, Plaintiffs assert that "there is [a] downstream injury with respect to the public not having visibility into

… properly registered Texans being discriminated against and burdened in their right to vote." The first theory was rejected by this court only a few weeks ago, and the other two theories encompass no more than alleged injuries to *the public* and *affected Texas voters writ large*.

*Scott*, 49 F.4th at 936 (emphasis added).

The Court noted further that plaintiffs "do not allege that identification of voter names and identification numbers will directly lead to action relevant to the NVRA or any other statute, nor that their direct participation in the electoral process will be hindered." *Id*. at 938.

Whereas the plaintiffs in *Scott* alleged speculative injuries to others not before the court, *Scott*, 49 F.4th 936 ("*the public* and *affected Texas voters writ large*) (emphasis added), the Foundation alleges injuries to *itself* that are directly traceable to the Commonwealth's refusal to disclose information under the NVRA. For example, the Foundation cannot effectively evaluate the accuracy of the Commonwealth's voter rolls nor the effectiveness of investigation and remedies undertaken by the Commonwealth in response to the PennDOT Error, activities that Congress intended when it passed the NVRA, *see Bellitto*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *12 ("To ensure that election officials are fulfilling their list maintenance duties, the NVRA contains public inspection provisions.").

The "downstream consequences" the Foundation identifies are consistent with the examples articulated by the *Scott* concurrence, including the need "to engage in public advocacy about a pressing matter of policy." *Scott*, 49 F.4th at 940 (Ho, J., concurring in the judgment).

Even assuming *Scott* correctly applied *TransUnion* and other Informational Injury cases, the Foundation has satisfied the *Scott* standard.

## II.    The District Court Correctly Held that the Requested Records are Within the Public Disclosure Provision's Scope.

The uniform weight of authority supports the District Court's interpretation of the NVRA, including *Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021), in which the Fourth Circuit held that a state election "Board's efforts in the present case to identify noncitizen registrants qualify as a 'program' or 'activity' to ensure an accurate list of eligible voters." The Commonwealth's efforts similarly qualify and therefore fall squarely within the Public Disclosure Provision's broad reach. The District Court did not err when it read the NVRA's text to mean what it says.

"In any case involving statutory interpretation, we must begin with the statutory text," *United States v. Moreno*, 727 F.3d 255, 259 (3d Cir. 2013) (citing *United States v. Gonzales*, 520 U. S. 1, 4 (1997), "and the assumption that the ordinary meaning of that language accurately expresses the legislative

purpose," *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175 (2009) (citations and quotations omitted). "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (citations and quotations omitted); *See also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citations omitted). "Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (citations and quotations omitted).

### A. The Commonwealth Has Waived Any Challenge to the District Court's Plain-Meaning Analysis.

The Commonwealth pays lip service to the rules of statutory construction, Doc. 25 at 26, but does not faithfully apply them. The Commonwealth does not examine the common meaning of *any* word or phrase nor explain why the District Court plain-meaning analysis was wrong. The Commonwealth has therefore waived any challenge to the District Court's definitional analysis. *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 296 n.7 (3d Cir. 2007) ("Absent compelling

circumstances … failing to raise an argument in one's opening brief waives it.");
*see also FDIC v. Deglau*, 207 F.3d 153, 169 (3d Cir. 2000) ("The Deglaus did not
raise this issue in their opening brief on appeal. They have therefore waived it, and
we will not address it.").

### B. Neither the Language, Context, nor Intent of the NVRA Supports the Commonwealth's View that the Public Disclosure Provision is Limited to Records Concerning Death and Relocation.

Despite the Commonwealth's waiver, it nevertheless argues that the Public
Disclosure Provision's scope is limited to records concerning "voters who died or
moved." Doc. 25 at 31. The District Court correctly rejected this interpretation.

### i. The NVRA's Words Unambiguously Encompass the Commonwealth's Activities.

Fundamentally, the Commonwealth's interpretation violates principles of
statutory construction. The Supreme Court instructs that "courts must presume that
a legislature says in a statute what it means and means in a statute what it says
there." *Germain*, 503 U.S. at 253-254. The language of the Public Disclosure
Provision is unambiguous: "Each state … shall make available for public
inspection … *all records* concerning the implementation of *programs and
activities* conducted for the purpose of ensuring the *accuracy and currency* of
official lists of eligible voters." 52 U.S.C. § 20507(i)(1) (emphasis added).

Congress did not limit these words to subsets of records. Rather, Congress made all list maintenance records subject to inspection, period.

Neither the word "death" nor the phrase "change in residency" appears in the Public Disclosure Provision. "[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Had Congress intended to limit the Public Disclosure Provision as the Commonwealth believes, it would have done so. However, "Congress did not write the statute that way." *Id*.

Relying on the words Congress wrote, the District Court concluded that the Commonwealth's activities plainly qualify as a "program" or "activity" under the NVRA. Appx014. A "'program' is 'a schedule or system under which action may be taken towards a desired goal,'" and "[a]n 'activity' is 'a natural or normal function or operation.'" Appx010 (citations omitted). "Applying these definitional terms," the District Court earlier concluded that "the [Public] Disclosure Provision requires states to disclose 'all records concerning the implementation' of a schedule or system designed to serve a specific end, or a particular function or

operation, 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" *Id*. (quoting 52 U.S.C. § 20507(i)(1)).

The Commonwealth does not dispute that its investigation, analysis, and remedial activities concerning the PennDOT Error were "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id*. Indeed, the Commonwealth clearly outlined the purpose of the analysis: "to investigate and address the concern that some ineligible individuals registered to vote[.]" ECF Doc. 66-4 at 1. The Commonwealth confirms its list-maintenance purpose at length in its First Step Brief. Doc. 25 at 4-5, 7-8. The District Court therefore logically concluded that "[t]he records requested by PILF were created pursuant to a system designed to identify ineligible voters based on their noncitizen status," and "[t]hus the Commonwealth's effort to identify noncitizen registrants is a 'program' or 'activity' designed to identify noncitizens and ensure an accurate and current list of eligible voters." Appx014. Any argument to the contrary is waived, undisputed, self-contradictory, and meritless.

The District Court's interprets the NVRA's scope consistently with two Fourth Circuit cases. In *Project Vote v. Long,* the district court held that "a program or activity covered by the Public Disclosure Provision is one conducted to ensure that the state is keeping a 'most recent' and errorless account of which

persons are qualified or entitled to vote within the state." 752 F.Supp.2d at 706. In that case, the plaintiff sought voter registration applications completed by students at a Historically Black University, and which were rejected by the local election official. The district court explained, "The process by which the Commonwealth determines whether a person is eligible to vote certainly falls within the purview of the federal statute, as such a process, by its very nature, is designed to ensure that the Commonwealth's lists are current and accurate." *Id*. The Public Disclosure Provision thus broadly requires public access to *all records* related to determinations of eligibility, like those requested by the Foundation. *E.g.*, ECF. No. 1-9 (describing requests). Notably, the Commonwealth seeks to shrink the covered categories under the NVRA to records related to death or change of residence, and the voter registration forms deemed subject to Public Disclosure by the court in *Project Vote* fall outside those limits.

Affirming the holding on appeal, the Fourth Circuit found citizenship verification on a voter registration form to be an indispensable part of the eligibility and list maintenance process.

> Without verification of an applicant's *citizenship*, age, and other necessary information provided by registration applications, state officials would be unable to determine whether that applicant meets the statutory requirements for inclusion in official voting lists."

*Project Vote*, 682 F.3d at 336 (emphasis added).

Later, in *Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*, 996

F.3d 257, 267 (4th Cir. 2021) ("*NCSBE*"), the Fourth Circuit directly held what it

had suggested in *Project Vote*—that efforts to determine the eligibility of

registered noncitizens qualify as programs and activities under the NVRA. *Id*. at

267 (holding that the "Board's efforts in the present case to identify noncitizen

registrants qualify as a 'program' or 'activity' to ensure an accurate list of eligible

voters.").

Pennsylvania law makes United States citizenship a requirement for

eligibility to vote, 25 Pa.C.S. § 1301(a)-(b), which is precisely what made the

PennDOT Error at the root of this case so problematic. Thus, Pennsylvania election

officials regularly use citizenship as one criterion used to "evaluate[] whether

persons belong on the list of eligible voters, thus ensuring the accuracy of those

lists." *Project Vote*, 752 F.Supp.2d at 707. Whether citizenship is evaluated

regularly, or in response to a decades-long "error," the "process of review is a

'program' because it is carried out in the service of a specified end—maintenance

of voter rolls—and it is an 'activity' because it is a particular task and deed of

election employees." *Project Vote*, 682 F.3d at 335.[8]

---

[8] *See also Bennett*, No. H-18-0981, 2019 U.S. Dist. LEXIS 39723, at *10 ("PILF
has alleged a plausible claim under the public disclosure provisions of §
20507(i).").

Evaluating the eligibility of voters based on citizenship status (or for any reason whatsoever)—and affirming or canceling registrations as necessary—falls squarely within the Public Disclosures Provision's mandate. That is exactly what the Commonwealth did. "All records" of the Commonwealth's actions are subject to disclosure. 52 U.S.C. § 20507(i)(1).

### ii. The District Court Correctly Declined to Read Additional Limitations into the NVRA's Text.

The Commonwealth's interpretation would also require this Court to insert words into the NVRA where Congress chose not to. The NVRA's text expressly "identifies the information which Congress specifically wished to keep confidential." *Project Vote*, 752 F.Supp.2d at 710. Such confidential information is limited to "records relate[d] to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). Congress included no other exceptions. *See Project Vote*, 682 F.3d at 336. The Foundation does not seek textually exempted information and thus no textual exemption applies here.

The District Court observed that "[t]he Disclosure Provision's two exceptions are narrow and specific," Appx011 (citing 52 U.S.C. § 20507(i)(1)). "The contrast between the broad mandate to disclose 'all' records and the tailored protection of two types of records implies that Congress crafted this provision

40

carefully. We will not (and indeed, must not) read unexpressed limitations into an unambiguous statute's terms." *Id*. (citations and quotations omitted).

The Commonwealth's reliance on the Federal Election Commission's guide, Doc. 25 at 38 n.7, suffers from multiple fatal defects. First, Congress did not authorize the FEC, or its successor, the Election Assistance Commission (EAC), to implement the NVRA. The FEC affirmatively disavowed having any such authority in the FEC guide's "Preface," which the Commonwealth omits from its brief. *See* FEC guide at P-1[9] ("It is very important to note, however, that the Federal Election Commission does *not* have legal authority either to interpret the Act or to determine whether this or that procedure meets the requirements of the Act."). This alone counsels against giving the FEC Guide any weight.

Next, "the courts are the final authorities on issues of statutory construction, and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n*, 390 U.S. 261, 272 (1968) (citations and

---

[9] *Available at*
https://www.eac.gov/sites/default/files/eac_assets/1/1/Implementing%20the%20NVRA%20of%201993%20Requirements%20Issues%20Approaches%20and%20Examples%20Jan%201%201994.pdf (last accessed Nov. 1, 2023).

quotations omitted). The FEC was squarely wrong about what the NVRA requires in terms of disclosure. The NVRA's plain text requires disclosure of "all records" concerning list maintenance activities, not just those included in Section 8(i)(2). *See Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 152 (3d Cir. 2004) (explaining that courts "owe no deference to an agency interpretation plainly inconsistent with the relevant statute ").

### iii. Section 8's Other Provisions Do Not Support the Commonwealth's Narrow Interpretation.

Even if the Commonwealth could overcome threshold definitional and plain-meaning matters—which it cannot—its narrow interpretation would still fail for want of contextual support. Citing approximately fifteen of Section 8's other subsections, the Commonwealth ultimately reasons that because the Public Disclosure Provisions "appears in the same section of the NVRA" as the requirement to remove deceased and relocated registrants, *see* 52 U.S.C. § 20507(a)(4), the word "programs" in the Public Disclosure Provision "must necessarily refer to the 'programs' to purge voters who died or moved, which are required by Section 20507(a)(4)." (Doc. 25 at 31.) The District Court correctly concluded that "[t]he Disclosure Provision's text and its neighboring subsections do not support this narrow interpretation." Appx010.

42

For starters, Section 20507(a)(4) is not the only list maintenance obligation that appears in Section 8, nor is it the only other subsection that uses the words "program" or "activity." Sections 20507(b) and (c) also appear alongside the Public Disclosure Provision. Those subsections are expansive, referring, respectively, to "*any* state *program or activity* to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office" and "*any program* the purpose of which is to systematically remove the names of *ineligible voters* from the official lists of eligible voters." (Emphases added). Under the Secretary's own proximity-based theory then, the Public Disclosure Provision would encompass *any* program or activity conducted for list maintenance purposes—including activities concerning cancellations based on citizenship. *See Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1344 (11th Cir. 2014) (interpreting NVRA Section 8(c)(2)(A) to govern programs to remove noncitizen registrants). Observing the "obvious" similarities between the Public Disclosure Provision and Subsection 20507(b), the District Court correctly concluded that "[i]t is more likely Congress's use of 'programs and activities' in the Disclosure Provision is a reference to subsection 20507(b), not the Mandatory Removal Provision," *i.e.*, Section 20507(a)(4).

Logic dictates that Congress intended each use of the word "program" or "activity" to stand alone, modified only by the preceding or succeeding language, unless explicitly modified by another subsection of the NVRA. Indeed, on at least 27 occasions in Section 8, Congress expressly refers to another section of the NVRA, another subsection of Section 8, or another statute. The District Court prudently recognized that "Congress knew how to refer to other subsections in drafting the NVRA," and "could have identified the Mandatory Removal Provision by section" if it intended to limit its reach. Appx011; *see also, e.g.*, 52 U.S.C. § 20507(i)(2) (requiring disclosure of the names and addresses of "all persons to whom notices described in *subsection (d)(2)* are sent") (emphasis added). Yet Congress chose not to limit the Public Disclosure Provision by reference to any other provision of the law. Instead, it designed the law for maximum transparency, requiring disclosure of "all records" concerning list maintenance activities.

The explicit exceptions Congress drafted also critically undermine the Commonwealth's argument. Neither a "declination to register to vote" nor the "agency" through which a registrant registered has anything to do with programs to remove deceased and relocated registrants. It would have made no sense for Congress to exclude these records by name, if the Public Disclosure Provision never included them at the outset. The Commonwealth's interpretation renders

these exceptions superfluous, and such a result should be avoided. *See Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018) ("An absurd interpretation is one that defies rationality or renders the statute nonsensical and superfluous.") (citations and quotations omitted).

The Foundation maintains that there is no need to look to the Public Disclosure Provision's neighboring provisions because the relevant text is clear, unambiguous, and susceptible of only one meaning on its face. To the extent those neighboring provisions provide interpretive help, they support the District Court's conclusion, for the reasons articulated above.

### iv. The Commonwealth's Narrow Interpretation Would Frustrate Congress's Intent.

The District Court also correctly concluded that its reading of the NVRA would "also further[] the NVRA's purposes." Appx013. Congress designed the NVRA to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). To further these goals, Congress made the voter list maintenance records subject to public inspection. *Bellitto*, 2018 U.S. Dist. LEXIS 103617, at *12-13 (explaining that the Public Disclosure Provision "convey[s] Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs."); *True the Vote v. Hosemann*, 43 F.

45

Supp. 3d 693, 721 (S.D. Miss. 2014) ("The NVRA Public Disclosure Provision is one means of ensuring compliance with the NVRA's stated goals. By opening up voter registration records for inspection, the Public Disclosure Provision shines a light on States' voter registration activities and practices.").

The Secretary's interpretation would allow election officials to conceal records concerning every facet of eligibility not related to death or residency. A Commonwealth registrant who did not die, did not move, yet was improperly canceled by election officials would be barred from reviewing the list maintenance records that led to her illegal cancellation. Despite Congress's intent to make such decisions transparent, the Commonwealth stubbornly insists on concealment. In the commonsense and error free words of the District Court, "a broad reading promotes the integrity of the voting process and ensures a public vehicle for ensuring accurate and current voter rolls." Appx013.

### v. The United States Rejects the Commonwealth's Narrow Interpretation.

The United States recently addressed the Public Disclosure Provision's scope in *amicus curiae* briefs filed in the First and Eleventh Circuits. In each brief, the United States rejects the Commonwealth's view that the Public Disclosure Provision is limited to records concerning registrant death and relocation.

In *Public Interest Legal Foundation v. Bellows*, the United States explained that the Public Disclosure Provision "applies to voter registration databases" like Maine's official list of eligible voters, *i.e.*, the voter roll. Doc. 00118033423 at 7, *Public Interest Legal Foundation v. Bellows*, Case No. 23-1361 (1st Cir., filed July 25, 2023). This is because the Public Disclosure Provision "regulates registration as well as list-maintenance activities." *Id*. at 12.

The United States rebutted the argument the Commonwealth makes here— namely, that "Section 8(i) reaches only the purposeful, periodic list-maintenance programs authorized and regulated by the remainder of § 8." *Id*. at 15 (citations and quotations omitted).

> Section 8(i)'s text cannot be read to tether disclosure to those programs alone. "If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote." *Biden* v. *Texas*, 142 S. Ct. 2528, 2539 (2022). It could have limited disclosure to records of "list-maintenance programs described in this section." Or it could have employed language like that in other provisions of Section 8, which limit themselves to the removal of names or other particular list-maintenance processes. *E.g.*, 52 U.S.C. 20507(a)(4), (c)(2), (d) and (f). But Section 8(i) uses general language, applying to *all* records concerning implementation of programs "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1).

*Id*. at 15 (emphasis in original).

In *Greater Birmingham Ministries v. Secretary of State for the State of Alabama*, the United States explained that the Public Disclosure Provision covers

47

list maintenance records related to felony convictions: "The district court correctly held that Section 8(i) applies both to lists of those denied registration generally, and to lists of those denied registration or removed from the voting rolls due to felony convictions specifically." Doc. 32 at 6, *Greater Birmingham Ministries v. Secretary of State for the State of Alabama*, Case No. 22-13708 (11th Cir., filed March 20, 2023).

In both cases, the United States based its position on the statute's text and the nature of the activities—that they concerned the accuracy of the voter roll— rather than limiting the statute's scope to activities mandated by law. *See* Doc. 00118033423 at 7-11, *Bellows*, Case No. 23-1361.; Doc. 32 at 6-10, *Greater Birmingham Ministries*, Case No. 22-13708.

The United States also confirms that "the FEC's rulemaking authority never extended to the NVRA's public disclosure provision." Doc. 00118033423 at 17, *Bellows*, Case No. 23-1361 (citing Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (as amended 52 U.S.C. 20508(a)).) "[I]t is the statute's clear language that ultimately controls." *Id*.

### vi. The Commonwealth's Response to the PennDOT Error Included Statutory Programs.

The imaginary wall the Commonwealth builds between its so-called "special investigation" of the PennDOT Error, Doc. 25 at 2, and "programs and activities

mandated by statute" ultimately does not help the Commonwealth. Most, if not all, registrants connected to the PennDOT Error were registered through a process mandated by the NVRA and Commonwealth law—namely, mandatory registration at state motor vehicle offices. *See* 52 U.S.C. § 20504(a)(1); 25 Pa.C.S. § 1323(a)(1). Records related to those registrations fall squarely within the NVRA's scope, even under the Commonwealth's interpretation.

Moreover, the Commonwealth explains that as part of response to the PennDOT Error, it initiated cancellations at the request of the registrant. Doc. 25 at 17. Again, these requests fall within the NVRA, 52 U.S.C. § 20507(a)(3)(A), and Commonwealth law, 25 Pa.C.S. § 1901(a)(1). Even if Congress limited the Public Disclosure Provision to statutory programs—which it did not—the Commonwealth would still be required to disclose the names and addresses of registrants who were sent the Affirm or Cancel Letter because such records "concern" the Commonwealth's statutory "programs."

### III.    The District Court Correctly Held that The Commonwealth Must Disclose Records Concerning Registrants Who Did Not Affirm Their Citizenship.

The Commonwealth sent 11,198 registrants a letter that asked each recipient to affirm or cancel her registration, *i.e.*, the Affirm or Cancel Letter. ECF 66 ¶ 68; Appx028; *see also* ECF 66-11. The District Court allowed the Commonwealth to

redact the names and addresses of letter recipients who "affirmed their eligibility to vote." Appx056 n.6. The District Court ordered them to produce the names and addresses of recipients "who responded to the letter by cancelling their registration, or who failed to reply to the letter or have not been confirmed to be citizens." *Id*.

The Commonwealth will not accept the balance the District Court struck, demanding the right to conceal even more of its response to an egregious, decades-long blunder. Enough is enough. The District Court properly balanced competing interests, while giving the NVRA effect. The decision below was correct.

### A. A Request to Cancel a Registration Record Is Not A "Declination to Register to Vote" under 52 U.S.C. § 20507(i)(1).

As explained earlier, the Public Disclosure Provision exempts two specific records, one of which is records that "relate to a declination to register to vote." 52 U.S.C. § 20507(i)(1). The Commonwealth asserts, for the first time on appeal, that anyone who responded to the Affirm or Cancel Letter by requesting *cancellation* of their voter registration record should be treated as *declining* registration under Section 20507(i)(1). (Doc. 25 at 38.)

This argument fails for at least two reasons. First, the Commonwealth waived it by not raising it before the District Court. *United States v. Joseph*, 730 F.3d 336, 337 (3d Cir. 2013) ("We hold that for parties to preserve an argument for

appeal, they must have raised the same *argument* in the District Court—merely raising an *issue* that encompasses the appellate argument is not enough.").

Second, cancellation and declination are two distinct acts, performed by two distinct persons (election officials and applicants, respectively), and Congress treated these actions differently in the NVRA.

Context and consistent usage cannons further support this view. Where Congress referred to canceling a voter registration record, it used the word "remove." For example, in Section 20507, Congress mentioned removing a registrant form the official list of eligible voters seven times, including removal "at the request of the registrant," 52 U.S.C. § 20507(a)(3)(A), the type of cancellation the Commonwealth contests. Naturally, for removal to occur, the registrant must already be registered. Thus, when Congress spoke of cancellation or removal, it referred to maintenance of *existing* voter registration records.

Where Congress referred to a "declination to register," it used a different word: "declination." Congress's use of a different word indicates that "declination" does not mean "remove" or cancel. *See Russello*, 464 U.S. at 23. ("[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Where

51

Congress used the word "declination" it was referring to an *applicant's* act of declining the opportunity to register in the first instance. For example, in Section 20504, Congress required applications provided at motor vehicle offices to include a statement explaining that "if an **applicant** declines to register to vote, the fact that the **applicant** has declined to register will remain confidential and will be used only for voter registration purposes." 52 U.S.C. § 20504(c)(2)(D)(ii). Section 20504's reference to confidentiality is also a clear reference the NVRA Public Disclosure exception for declination data, 52 U.S.C. 20507(i)(1).

In Sections 20506 and 20508, Congress further addressed "declination" in terms of the application process. 52 U.S.C. § 20506(a)(6)(B) (addressing requirements for applications provided by public assistance offices); 52 U.S.C. § 20508(b)(4)(ii) (addressing the requirements for the mail voter registration form). Like Section 20504, Section 20508 also refers to the confidentiality of declination data, 52 U.S.C. § 20508(b)(4)(ii), which is another clear reference to the NVRA Public Disclosure Provision's exception for the same data.

Considering that Congress designed the NVRA to shed light on the work of election officials, it makes sense to treat cancellations differently than declinations. Cancellation—even when performed at the request of a registrant—is an act of maintenance performed by election officials. Transparency reveals whether

officials acted appropriately and lawfully. A declination of registration, on the other hand, is an act performed by an individual person and requires no action by officials.

### B. The District Court Appropriately Balanced the NVRA Public Disclosure Provision with the DPPA.

The Commonwealth raised the Driver's Privacy Protection Act ("DPPA") below as a defense to disclosure under the NVRA. The DPPA regulates the use of driver's license records—not voter list maintenance records. The DPPA prohibits disclosure of "personal information … about any individual obtained by the department in connection with a motor vehicle record[.]" 18 U.S.C. § 2721(a)(1). "Personal information" includes names and addresses contained in motor vehicle records. 18 U.S.C. § 2725(3). The DPPA is implicated here only because the Commonwealth chose to compare voter registration records to PennDOT records as part of its response to the PennDOT Error. *See, e.g.*, Appx093 ¶ 12; Appx094 ¶ 17.

The District Court read the DPPA to mean what it says and applied it so that the NVRA and the DPPA both remain effective because "courts are not at liberty to pick and choose among congressional enactments." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). "[W]hen two statutes are capable of co-existence, it is the

duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id*.

In its order denying the Commonwealth's motion to dismiss, the District Court explained, "The glitch-related records and derivative lists created during the Commonwealth's investigation are protected by the DPPA **to the extent they include** personal information obtained by the DMV in connection with a motor vehicle record." Appx017 (emphasis added). In its order disposing of the parties' summary judgment motions, the District Court unpacked its prior holding, explaining,

> The Commonwealth's interpretation of our ruling is overbroad. As indicated by our use of the phrase "to the extent they include," our holding applies only to the personal information obtained from DMV motor vehicle records and information derived from that personal information. (See Doc. 23 at 17). Our holding does not protect information derived from non-DMV sources even when that information is included in a record containing personal information obtained from DMV records.

> When the entirety of the information in a document or other record is derived from personal information obtained from DMV records, the whole of the record may be withheld. Nevertheless, when only some of the information is or derives from personal information obtained from DMV records, the record or document must be disclosed with only personal information or derived information redacted.

Appx036-037.

The District Court's correctly concluded that the DPPA "does not protect information derived from non-DMV sources even when that information is included in a record containing personal information obtained from DMV records" because the DPPA protects only personal information "obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721. As the District Court recognized, "[p]ersonal information is 'from' a motor vehicle record when it derives from state DMV sources." Appx016.

The narrow scope of the DPPA exemption also reveals what is *not* exempt from disclosure: information that was *not* derived from DMV sources. The immense scope of non-exempt information includes *any* information obtained in connection with a voter registration record or list maintenance activity.

Other than the INS indicator and perhaps driver's license number, all registrant data used to mail letters to registrants —including the registrant's name and address—was already in the Commonwealth's possession throughout the entire review of the PennDOT Error and well before any comparison with PennDOT records. That the Commonwealth chose to look at discrete and isolated data in motor vehicle records to help verify citizenship status does not transmogrify *all* voter registration records held by the election officials into data that is confidential under *other* federal laws—particularly information provided on

a registration application, like name and address. *See Project Vote*, 682 F.3d 331 (applications subject to disclosure under NVRA). As a matter of well-established law, the Commonwealth's argument holds no merit.

To find as the Commonwealth urges would elevate the DPPA over the NVRA in contravention of the Supreme Court's instruction to harmonize federal laws and apply them so that "each [i]s effective." *Mancari*, 417 U.S. at 551. The District Court followed those instructions and applied the DPPA so that only information derived *exclusively* from motor vehicle records would remain confidential, and so that voter list maintenance records would be transparent, as Congress intended. That correct decision should not be disturbed.

### C. The Commonwealth's Baseless Speculation Cannot Veto Federal Law.

The Commonwealth strays even further from the relevant inquiry when it conjures up imaginary threats as a last resort to conceal its activities. In this fiction, the Commonwealth includes "expos[ing] eligible voters on the list to the threat of unwarranted criminal prosecution and the risk of other harassment and abuse," discouraging "eligible citizens from registering to vote," and "discrimination, especially toward minority groups." Doc. 25 at 40-41. The Foundation never had an intention to engage in these activities, and the Commonwealth's musings should not be treated as relevant facts of record.

More problematic for the Commonwealth, the Elections Clause does not tolerate restrictions on Congressional powers based on an upside down strict-scrutiny style analysis. Congress decides what must be disclosed, not state officials imagining scenarios where they invent compelling reasons in order to replace the laws Congress passed.

The Commonwealth even resorts to personal attacks on the Foundation, imagining that if this Court affirms the judgment it will result in threats, harassment, and abuse. (Doc. 25 at 40.) Nonsense. The Commonwealth also inaccurately references unfounded and unproven accusations made against the Foundation by ideological opponents. (Doc. 25 at 41 n.41.) If the Commonwealth suggests that the Foundation, specifically, should be denied the benefit of federal rights, the Foundation *may have a claim against the Commonwealth for viewpoint discrimination.* America is a country where government officials are not allowed to disregard the law when the law benefits those with whom government officials disagree. Regardless, federal laws against voter intimidation already address the Commonwealth's proffered concerns, all of which will survive this case. *See Doe v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring).

Courts have granted exemptions from facially valid disclosure laws in rare, specific, and extreme cases. In *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462

(1958), petitioners "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." The plaintiffs in *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 99 (1982) likewise "introduced proof of specific incidents of private and government hostility" including "the firing of shots at an SWP office." In contrast, courts deny exemptions where a plaintiff presented "anecdotal evidence … that offers merely a speculative possibility of threats, harassment, or reprisals." *Doe v. Reed*, 823 F. Supp. 2d 1195, 1204 (W.D. Wash. 2011); *see also Protectmarriage.com v. Bowen*, 830 F. Supp. 2d 914, 933 (E.D. Cal. 2011) (requiring "evidence of thousands of acts of reprisals, threats or harassment" to obtain disclosure exemption). Here, "no evidence" of threats or harassment exist so, no exemption is warranted. *Citizens United v. FEC*, 558 U.S. 310, 370 (2010) (discussing disclosure of campaign contributions).

The Commonwealth's defense rests entirely on speculation —that if the Foundation learns how Commonwealth officials created and responded to a decades-long blunder, the public at-large will refuse to participate in the electoral process. The Commonwealth explains that it already produced the names and voting histories of registrants whose voter registrations were canceled and the

"reason for the cancelation by a county is listed in the SURE system as non-citizen[.]" (Doc. 25 at 13.) Yet the Commonwealth fails to offer a single instance where voter participation was discouraged, or where a cancelled registrant experienced any type of harassment or threat.

The District Court properly considered privacy issues and prudently "adopted the redaction scheme employed by the Court of Appeals for the Fourth Circuit in a similar case," *NCSBE*, 996 F.3d at 267. This redaction scheme allows the Commonwealth to redact the identities of any letter recipients who was "'initially identified as potentially failing to meet the citizenship requirement for voter registration but ultimately exonerated.'" Appx038 n.7 (quoting *N.C. State Bd. of Elections*, 996 F.3d at 267).

Of the 11,198 individuals who received the Affirm of Cancel Letter, 1,915 "affirmed their registration." (ECF 66-4 at (1)(a)(i)(1).) Those 1,915 registrants are the only registrants who can be characterized as "exonerated" because "exonerated" means "to clear from accusation or blame." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/exonerate. Registrants who cancelled their registrations or did not return the Affirm or Cancel Letter were not "exonerated," as the District Court recognized. Appx056 n.7 ("Neither category of individuals was "exonerated.").

This redaction scheme is logical because, as the Fourth Circuit observed, it is "[b]eing *improperly* identified as a noncitizen" that raises privacy concerns, not merely being subjected to scrutiny. *NCSBE*", 996 F.3d at 267. Voter list maintenance naturally involves scrutiny. If scrutiny were enough, the exception would swallow the rule, and erode the transparency Congress intended.

The District Court prudently chose tailored redactions over complete withholding, recogniz[ing] [that] such disclosures affect the privacy of these individuals, but Congress prioritized transparency over privacy in crafting the NVRA's broad disclosure requirements." Appx056. To be sure, Congress, not the Commonwealth, determines federal policy. On that point, the Fourth Circuit's reasoning is also particular apt:

> It is not the province of this court, however, to strike the proper balance between transparency and voter privacy. That is a policy question properly decided by the legislature, not the courts, and Congress has already answered the question by enacting NVRA Section 8(i)(1), which plainly requires disclosure of completed voter registration applications.

*Project Vote*, 682 F.3d at 339-40.

### D. Congress Intended for Disclosure of Names and Addresses.

The Commonwealth's request to conceal names and addresses is also inconsistent with Congress's view that disclosure of such information is necessary to achieve the NVRA's purposes. In Section 20507(i)(2) Congress made personally

identifying information public—specifically, "names and addresses." 52 U.S.C. §
20507(i)(2). Without personally identifying information one registrant cannot be
distinguished from another. In other words, the public cannot effectively evaluate
the efficacy and lawfulness of officials' actions unless the public can accurately
identify the subject of a particular list maintenance action, such as
disenfranchisement via cancellation.

The mandatory disclosures described in Section 20507(i)(2) are the "names
and addresses of all persons to whom notices described in subsection (d)(2) are
sent, and information concerning whether or not each such person has responded to
the notice as of the date that inspection of the records is made." The notices
"described in subsection (d)(2)" are address confirmation notices. *See* 52 U.S.C. §
20507(d)(1)-(2). In other words, Section 20507(i)(2) requires disclosure of the
names and addresses of registrants whose eligibility to vote requires more scrutiny
in terms of residency.

Compare the mandatory disclosures to the records the Commonwealth asks
to conceal: the names and addresses of "registrants whose eligibility to vote
required additional scrutiny in terms of citizenship." Appx028. In each case, the
registrants in question received a letter concerning their eligibility. The records are
essentially the same. It is unreasonable, if not absurd, to think that Congress would

61

require the public disclosure of voter's names and addresses with respect to one criterion for eligibility (residency), while tolerating the Commonwealth's concealment of the same information with respect to a different criterion for eligibility (citizenship).

The District Court did not err when it simply treated similar records the same. The Commonwealth's demand for additional, extra-textual exemptions is meritless. What is reasonable—and what is consistent with the NVRA's purposes—is to conclude, as the District Court did, that Congress believed public disclosure of names and addresses is required and necessary to achieve the statute's goals of making election officials' work transparent.

## IV.    The District Court Erred When It Held that the Commonwealth's Voter List Maintenance Records Qualify as Attorney Work Product.

According to the Commonwealth, at some point in "late-2017," it hired outside counsel, who then hired a so-called "expert," who performed the Noncitizen Matching Analysis—the analysis that ultimately determined which registrants should receive letters concerning their eligibility, including the Affirm or Cancel letter. (*See* Doc. 25 at 7-8.)

The District Court held that "the work-product doctrine shields the records produced in conjunction with the noncitizen matching analysis from disclosure." The District Court noted:

Our holding on this point should not be construed as stating that the work-product doctrine applies to: (1) the analysis done by the Commonwealth before retention of the expert, (2) records used by the expert to conduct their analysis, or (3) the thousands of letters sent to potential noncitizen registrants based upon the results of the noncitizen matching analysis. The work-product doctrine applies solely to the documents and records produced by the expert at the request of counsel in anticipation of litigation.

Appx043 n.11. The District Court clarified its holding further in a subsequent

order:

The intention of our footnote was to make clear that records otherwise subject to disclosure do not receive work-product protection merely because the expert viewed them. That is, records *created specifically* for the expert to review are protected by the work-product doctrine, (see Doc. 83 at 18-20), but the work-product doctrine does not protect records otherwise subject to disclosure created in the ordinary course of business or for purposes other than litigation[.]

Appx055 n.4. Relying on these rulings, the Commonwealth appears to have

withheld *all records* sent to, considered, or used by its "expert" as part of the

Noncitizen Matching Analysis.

The District Court erred when it held that the attorney work product

doctrine applied to these records in these circumstances.

## A. The Attorney Work Product Doctrine.

The attorney work product doctrine protects "documents and tangible things

that are prepared in anticipation of litigation or for trial by or for another party or

its representative[.]" Fed. R. Civ. P. 26(b)(3)(A). Third Circuit considers "the

nature of the document[s] and the factual situation" to determine whether "the document[s] can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir. 1990) (citations and quotations omitted). Fundamentally, "[t]he preparer's anticipation of litigation must be objectively reasonable." *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir.1993). "This requires proof of 'an identifiable specific claim or impending litigation when the materials were prepared.'" *Fox v. Lackawanna Cty.*, No. 3:16-CV-1511, 2018 U.S. Dist. LEXIS 145073, at *8 (M.D. Pa. Aug. 27, 2018) (citations omitted). The "rule of thumb" is that "'if the document would have been created regardless of whether litigation was expected to ensue, the document is deemed to have been created in the ordinary course of business and not in anticipation of litigation.'" *Heinzl v. Cracker Barrel Old Country Store, Inc.*, No. 2:14-cv-1455, 2015 U.S. Dist. LEXIS 146825, at *17 (W.D. Pa. Oct. 29, 2015) (citations omitted). In addition, "'the material must have been produced because of the prospect of litigation and for *no other purpose*.'" *United States v. Ernstoff*, 183 F.R.D. 148, 156 (D.N.J. 1998) (citations omitted). Business documents' mere "'potential use in pending litigation does not turn these documents into work product or confidential communications between client and attorney.'" *Id*. (citations omitted).

### A. The Commonwealth Was Motivated by the Need to Remedy a Long-Standing List Maintenance Mistake.

The Commonwealth's need and desire to fix its egregious voter list maintenance blunder due to the PennDOT Error motivated its actions. The Commonwealth response to the PennDOT Error stretches back to at least September 2015, more than *two years* before the Foundation's records request, and more than *two years* before outside counsel hired the "expert." *See* ECF 70-6 at 3 (September 2015 entry); ECF 66-1 at 115:2-7.

The Commonwealth conducted the Initial Analysis using PennDOT records in the Summer of 2017, months before the Foundation's records request. *See* ECF 70-6 at 3 (August 2017 entry); (ECF 66 ¶¶ 47-52 (describing analysis)). More than one month before the Foundation's records request, the Commonwealth conducted the Statewide Analysis, which included a review of SURE system records "that were cancelled for the reason 'Not a Citizen.'" ECF 70-6 at 3 (September 2017 entry); ECF 64-1 ¶¶ 9-10; ECF 66 ¶¶ 55-61. Why did the Initial Analysis and Statewide Analysis happen? The Commonwealth explains that it "wanted to understand both the scope of the issue and, and also the potential causes of it, *so that any additional enhancements that [it] made would be effective*." ECF 66-1 at 115:12-21; *see also* ECF 66-2 at 1 ("The Department undertook an analysis of the statewide voter registration database to determine whether ineligible residents were

registering and voting. We are using this analysis as a starting point to examine every part of the voter registration process."). In other words, the Commonwealth aimed to understand its problem and find a remedy that would improve its list maintenance process.

At that point, the Commonwealth had not yet contacted any registrants to notify them of the PennDOT Error or to ask them to confirm their eligibility. This was a logical next step in the process, and shortly after the Statewide Analysis concluded, the Commonwealth conducted yet another analysis, ECF 66 ¶¶ 62-74—the Noncitizen Matching Analysis. The Commonwealth stated the purpose of the Noncitizen Matching Analysis in a July 2018 written statement: "to investigate and address the concern that some ineligible individuals registered to vote[.]" ECF 66-4 at 1. The Commonwealth explained further that the "goal in this process was to protect the integrity of elections in Pennsylvania." *Id*. Defendants even revealed that it "knew that it was imperative to address the problem" "*when [it] learned* that ineligible residents may have registered to vote…." *Id*. (emphasis added). In other words, the Noncitizen Matching Analysis was part and parcel of the Commonwealth's holistic list maintenance response to the PennDOT Error, a response that began as early as 2015. If there remains any doubt, consider the Commonwealth's conclusion in its July 2018 statement: "We remain confident that

this careful, deliberate approach was the most responsible way **to remedy a**

**decades-old problem** while ensuring that no eligible voter is disenfranchised." *Id.*

(emphasis added).

The Commonwealth bears the burden of showing that the documents in

question were prepared in anticipation of litigation. *Holmes v. Pension Plan of*

*Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000). On the Commonwealth's

side of the ledger is a single paragraph in a conclusory, self-serving affidavit from

Defendant Jonathan M. Marks. Appx094 ¶ 17. Defendant Marks states, "The work

performed by the consulting expert was at the request of counsel, was in

anticipation of litigation from any number of sources arising from the PennDOT

software glitch and was for the purpose of providing legal advice." *Id.* Privilege

claims based on similarly thin, self-serving support have been rejected. *See*

*Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 540 (N.D. Ill. 2000)

(rejected claim based on "self-serving statement"); *Maint. Enters. v. Dyno Nobel,*

*Inc.*, No. 08-CV-170-B, 2009 U.S. Dist. LEXIS 139793, at *19 (D. Wyo. Nov. 13,

2009) (rejecting claim based on "single statement in [an] affidavit").

The Commonwealth's proffered concern about "litigation from any number

of sources" does not establish "objectively reasonable" anticipation, *Martin*, 983

F.2d at 1260, nor "proof of an identifiable specific claim," *Fox*, 2018 U.S. Dist.

67

LEXIS 145073, at *8 (quotations omitted). In fact, it shows the opposite—that the Commonwealth now claims to have believed the threat of litigation might simply be in the air. The Commonwealth must show more than a retroactive claim to a nervous disposition to invoke the attorney work product doctrine.

The Commonwealth does not state the potential cause of action or litigation theory it feared, even in general terms. No action would lie under the NVRA because as the Commonwealth often repeats, the statute requires removal of only deceased and relocated registrants. *See* 52 U.S.C. 20507(a)(4). Nor could an action lie under Commonwealth law because as the Commonwealth explains, "Pennsylvania does not have a program for systemically targeting and removing suspected non-citizens from the voter rolls." Doc. 25 at 32. Furthermore, the record lacks even a scintilla of evidence that noncitizens impacted by the PennDOT Error considered legal action.

Nor would it make any sense to fear litigation based on the Foundation's records request. The work-product privilege protects documents, not facts within those documents. *Heinzl*, 2015 U.S. Dist. LEXIS 146825, at *13-14. It is circular and nonsensical to conclude that that responsive records were created because, and only because, the Commonwealth allegedly feared litigation aimed at obtaining those same records. Zero record evidence supports the Commonwealth's belief that

litigation seeking any other type of relief was likely or possible. The last thing a

reasonable official would do if she feared public-records litigation is create more

public records—unless, of course, the creation of those records had an entirely

different purpose—such as remedying a longstanding list maintenance problem—

which is plainly the case here.

To find that the Noncitizen Matching Analysis had "no other purpose" than

litigation readiness, *Ernstoff*, 183 F.R.D. at 156, requires the Court to also find that

the requested records would *not* have been created absent litigation fears. In other

words, this Court must accept that the Commonwealth would not have contacted

registrants about their eligibility if it did not believe it would be sued. Such a

finding cannot be sustained on the record. The Commonwealth set out to remedy

the PennDOT Error when it learned of the problem in 2015. It engaged in

preliminary analyses to assess the problem from a high level ("Initial Analysis").

The Commonwealth then investigated how many registrants had *already* been

removed from the voter roll for citizenship defects ("Statewide Analysis"). One

thing was missing—the Commonwealth had yet to implement a remedy to address

potential noncitizens who were *currently* registered to vote.

Enter the Noncitizen Matching Analysis. This final stage of the process was

about completing the remedy—not litigation. "[T]he factual situation in th[is]

particular case" demonstrates that the allegedly privileged analysis was conducted "in the ordinary course of business" *Rockwell Int'l*, 897 F.2d at 1265-66, and would have proceeded as planned "regardless" of whether the Foundation had asked to inspect records. *Heinzl*, 2015 U.S. Dist. LEXIS 146825, at *17.

*Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124 (3d Cir. 2000) is instructive. *Holmes* involved claims for interest payments on pension benefits under the Employment Retirement Income Security Act. *Id*. at 128. Before seeking relief in federal court, one of the appellants "pursued his interest claim through administrative channels. His original claim to interest prompted a Plan attorney to prepare a legal memorandum analyzing the merits of the claim. Once judicial action had been initiated, Appellants moved to compel production of that memorandum during discovery." *Id*. at 138. The Magistrate Judge "concluded that 'it is apparent the [memorandum] was prepared in anticipation of possible future litigation. In addition, it is reasonable to conclude that the document would not have been prepared but for the prospect of litigation.'" *Id*. at 138. The District Court affirmed. *Id*. The Third Circuit disagreed.

> The Magistrate Judge's conclusions may be reasonable, but they are based on nothing more than assumptions. There is nothing in the record indicating that the Defendants have carried their burden of showing that the memorandum was, in fact, prepared in anticipation of possible litigation. Indeed, the Defendants appear to have claimed nothing more than that "the memorandum was written in connection with the claim

by Plaintiff Holmes . . . and . . . is, therefore, privileged and immune from discovery under . . . the work product doctrine." … The mere fact that the memorandum was prepared "in connection with" Plaintiff Holmes' administrative claim to interest on his delayed benefits hardly establishes that it was prepared in anticipation of litigation. The Magistrate Judge abused his discretion in assuming otherwise. Therefore, we will reverse the order denying Appellants' request for production.

*Id*. at 139.

The District Court similarly based its ruling on assumptions.

The risk of litigation in the wake of a public scandal involving the possibility of illegal voting, coupled with an atmosphere of anxiety about election security, is obvious. In the instant matter, despite the absence of a specific notice of intent to file suit, the general threat of litigation in the wake of such a resonant scandal is sufficient to invoke the work-product doctrine. It is clear to the court that, in light of the hue and cry over the glitch, the Commonwealth developed the noncitizen matching analysis with the assistance of its expert as a means of responding to heightened scrutiny of the kind that would be imposed through the civil justice system.

Appx040-041. None of these sentences are supported by a citation to the record. "Anxiety," "scandal," and generic "heightened scrutiny" are amorphous concepts that do not naturally create an objectively reasonable "risk of litigation." The District Court faulted the Foundation for not overcoming the assumed risk factors described above. That is not the Foundation's burden. The work product doctrine requires the Commonwealth to prove an objective risk of litigation exists. *Holmes*, 213 F.3d at 138. The Commonwealth has not done so. It has "claimed

71

nothing more" than the work of its expert was done in anticipation of litigation. Appx094 ¶ 17, the same conclusory, self-serving claim that was rejected in *Holmes*, 213 F.3d at 139.

Even if some documents qualify as attorney work product, the judgment on this issue should be reversed because the Commonwealth did not justify the attorney work product privilege on a document-by-document basis, provide a privilege log, or produce records with privileged material redacted. *See Rockwell Int'l*, 897 F.2d at 1265 (explaining that "claims of attorney-client privilege must be asserted document by document, rather than as a single, blanket assertion").

### B. Due to the Passage of Time, the Absence of Litigation, and the Compelling Need for Transparency, the Attorney Work Product Doctrine Should Yield to Congress's Goals in These Circumstances.

Six years have passed since the Commonwealth believed litigation was likely to ensue. Yet no litigation has ensued. The "hue and cry," Appx041, over the PennDOT Error disappeared years ago. Interested legislative committees have moved on to other matters. The Commonwealth cannot seriously maintain that it presently fears litigation. Yet the Foundation and the public remain in the dark.

The impact of the District Court's ruling cannot be understated: as applied here, the attorney work product doctrine would obliterate a federal law Congress passed to protect the right to vote. Because the Commonwealth abdicated its voter

list maintenance responsibilities to outside counsel, the public is unable to answer

vital questions about how its government identified ineligible registrants in the

Commonwealth. Which questions cannot be answered? Here's a few:

1. Who was the expert hired to make eligibility determinations?

2. What made him or her an "expert" in determining whether a registrant is potentially a foreign national?

3. How did the expert determine which registrants "required additional scrutiny in terms of citizenship?" Appx028.

4. What were the steps in the expert's methodology, *e.g.*, which databases did the expert use or not use?

5. How did the expert decide that only 11,198 registrants should receive eligibility letters, when the Commonwealth's prior analysis revealed more than 100,000 registrants with INS indicators in their motor vehicle records? *See* Statement of Facts ¶ 6, *supra*.

6. How did the expert or the Commonwealth determine the recipient's address for the Affirm or Cancel letter (recall: more than 1,900 letters were sent to outdated addresses (*see* ECF 66-4 at 3)).

7. Did the Commonwealth scrutinize each registrant with cause or without cause?

Congress designed the NVRA Public Disclosure Provision so the public could

answer these questions. But the public cannot answer these questions because the

Commonwealth is hiding behind the attorney work product doctrine, thereby

frustrating the intent of Congress.

Attorney work product protection is not absolute and can be overcome by a

showing that the opposing part has a "substantial need" for the requested

documents. This dispute primarily involves documents prepared by a non-attorney

"expert," which would qualify as "ordinary work product." *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003). Such documents ordinarily do not receive enhanced protection in the discovery process and can be obtained by showing "need and hardship." *Id*.

This is not a discovery dispute. Yet the unique circumstances of this case, the paramount importance of transparency in the electoral process, the countervailing interests rooted in the NVRA, and the low-level of protection ordinarily afforded work product of the type at issue, warrant similar considerations. The Foundation and the public need the records to further Congress's goals. The Foundation and the public will face hardship if the Commonwealth's list maintenance records remain shielded for all time. On the other hand, the Commonwealth will remain similarly situated. In these circumstances, the attorney work product doctrine should not stand as an obstacle to Congress's objectives.

## CONCLUSION

For these reasons, this Court should affirm the judgment in the Foundation's favor and reverse the District Court's finding that the Commonwealth's voter list maintenance records qualify as attorney work product.

Dated: November 3, 2023.

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:

> Linda A. Kerns, Esquire
> LAW OFFICES OF LINDA A. KERNS, LLC
> 1420 Locust Street – Suite 200
> Philadelphia, PA 19102
> PA Atty ID 84495
> Tel: (215) 731-1400
> Fax: (215) 701-4154
> linda@lindakernslaw.com
>
>   /s/ Noel H. Johnson
> Noel H. Johnson
> Kaylan L. Phillips
> Attorneys for Public Interest Legal Foundation, Inc.
> 107 S. West Street, Ste. 700
> Alexandria, VA 22314
> (703) 745-5870
> njohnson@PublicInterestLegal.org
> kphillips@PublicInterestLegal.org

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

Pursuant to Circuit Rule 46.1(e), I certify that I am a member in good

standing of the bar of the United States Court of Appeals for the Third Circuit.


<u>    /s/ Noel H. Johnson          </u>
Noel H. Johnson
Counsel for Public Interest Legal Foundation

Dated: November 3, 2023.

## CERTIFICATE OF COMPLIANCE AND
## VIRUS SCAN CERTIFICATION

I, Noel H. Johnson, certify the following:

1.     This brief complies with the type-volume limits of Fed R. App. P.

28(e)(2)(B)(i) because, excluding the parts of the brief exempted by Rule 32(f),

this brief contains 15,299 words.

2.     This brief also complies with the typeface requirements Fed. R. App.

P 32(a)(5)(A) because this brief has been prepared in a proportionally space type

face using Microsoft Word in 14-point Times New Roman.

3.     The text of the electronic and hard copies of this brief are identical;

and,

4.     A virus scan was run on the electronic version of this brief using

Avast Business Antivirus, which detected no viruses.


      /s/ Noel H. Johnson
Noel H. Johnson
Counsel for Public Interest Legal Foundation

Dated: November 3, 2023.

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2023, I electronically filed the

foregoing using the Court's ECF system, which will serve notice on all parties.

 /s/ Noel. H Johnson
Noel H. Johnson
njohnson@publicinterestlegal.org