Nos. 23-1590 & 23-1591

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

PUBLIC INTEREST LEGAL FOUNDATION,

Plaintiff-Appellee-Cross-Appellant

v.

SECRETARY OF THE COMMONWEALTH OF
PENNSYLVANIA and JONATHAN M. MARKS, in his
official capacity as Deputy Secretary for Elections and Commissions,

Defendants-Appellants-Cross-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF-APPELLEE-CROSS-APPELLANT AND URGING AFFIRMANCE
ON THE ISSUE ADDRESSED HEREIN

———————————

KRISTEN CLARKE
  Assistant Attorney General

TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES .................................................1

STATEMENT OF THE ISSUE.............................................................1

STATEMENT OF THE CASE...............................................................2

    A.    Statutory Background.............................................................2

    B.    The Present Controversy .......................................................3

SUMMARY OF ARGUMENT..............................................................8

ARGUMENT

    The NVRA requires the Secretary to disclose records related to efforts to find and remove noncitizens from Pennsylvania's voter rolls.................................................................................................9

    A.    Section 8(i) covers records of investigations into noncitizen voter registration and removals of noncitizen registrants. ...................................................................9

    B.    The Secretary's restrictive view of Section 8(i) conflicts with Section 8(i)'s text, context, and purpose. ...................................16

        1.    Section 8(i) applies beyond records related to Section 8(a)(4) removal programs. ...........................16

        2.    Section 8(i) requires release of records related to those who responded to Pennsylvania's inquiries by canceling their registrations. .................................26

    C.    States may redact certain information before disclosing Section 8(i) records. ...........................................28

CONCLUSION ...................................................................................30

**TABLE OF CONTENTS (continued):**

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                                      **PAGE**

*Al-Hasani v. Secretary U.S. Dep't of Homeland Sec.*,
  81 F.4th 291 (3d Cir. 2023) ................................................................... 10, 26

*American C.R. Union v. Philadelphia City Comm'rs*,
  872 F.3d 175 (3d Cir. 2017) ............................................................. 9, 13, 19

*Arcos Sanchez v. Attorney Gen. of U.S.*, 997 F.3d 113 (3d Cir. 2021).................... 12

*Biden v. Texas*, 142 S. Ct. 2528 (2022) .................................................... 17

*Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545 (3d Cir. 2017) .......................... 18, 20

*Garrett v. Murphy*, 17 F.4th 419 (3d Cir. 2021)........................................... 27

*Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998) ................................. 18

*Khan v. Attorney Gen. of U.S.*, 979 F.3d 193 (3d Cir. 2020) .......................... 9, 19

*Marmon Coal Co. v. Director, Off. of Workers' Comp. Programs*,
  726 F.3d 387 (3d Cir. 2013) ............................................................... 25

*Mercy Cath. Med. Ctr. v. Thompson*, 380 F.3d 142 (3d Cir. 2004) ...................... 25

*Patel v. Garland*, 596 U.S. 328 (2022) .................................................... 12

*Port Hamilton Refin. & Transp., LLLP v. United States EPA*,
  75 F.4th 166 (3d Cir. 2023) ............................................................... 25

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) ....... *passim*

*Public Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) ............................................................ *passim*

*Riccio v. Sentry Credit, Inc.*, 954 F.3d 582 (3d Cir. 2020) (en banc)...................... 15

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760 (3d Cir. 2018)............................ 13

**CASES (continued):** PAGE

*United States v. Bryant*, 996 F.3d 1243 (11th Cir.),
 *cert. denied*, 142 S. Ct. 583 (2021)................................................20

*United States v. Gonzales*, 520 U.S. 1 (1997)..........................................12

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................24

*United States v. Smukler*, 991 F.3d 472 (3d Cir. 2021) ..........................15

**STATUTES:**

Drivers Privacy Protection Act
 18 U.S.C. 2721..............................................................................5

Help America Vote Act
 52 U.S.C. 21083(a)(2)(B) ...........................................................20
 52 U.S.C. 21083(a)(4) ................................................................11
 52 U.S.C. 21083(a)(5)(B)(i) .......................................................20
 Pub. L. No. 107-252, § 802, 116 Stat. 1726 (2002) ....................25

National Voter Registration Act
 52 U.S.C. 20501(a) ........................................................................2
 52 U.S.C. 20501(b)......................................................................15
 52 U.S.C. 20501(b)(1)-(2)......................................................16, 22
 52 U.S.C. 20501(b)(2)-(3)...........................................................16
 52 U.S.C. 20501(b)(4) .................................................................15
 52 U.S.C. 20504(c)(1) ..................................................................27
 52 U.S.C. 20504(c)(2)(B)(ii) .......................................................19
 52 U.S.C. 20504(c)(2)(C).............................................................19
 52 U.S.C.20504(c)(2)(D)(ii)..........................................................26
 52 U.S.C. 20504(e) .......................................................................22
 52 U.S.C. 20504-20506 ................................................................19
 52 U.S.C. 20505(a) .......................................................................27
 52 U.S.C. 20506(a)(6)(A)..............................................................27
 52 U.S.C. 20506(a)(6)(B)(iii)........................................................27
 52 U.S.C. 20506(a)(7) .............................................................26-27
 52 U.S.C. 20506(d) .......................................................................22
 52 U.S.C. 20507...................................................................2, 20-21
 52 U.S.C. 20507(a) .......................................................................21

**STATUTES (continued):** PAGE

52 U.S.C. 20507(a)(1) ........................................................... 21-22

52 U.S.C. 20507(a)(3) ................................................................18

52 U.S.C. 20507(a)(3)(A) ...........................................................27

52 U.S.C. 20507(a)(5)(A) ...........................................................21

52 U.S.C. 20507(a)(4) ........................................................*passim*

52 U.S.C. 20507(b) ....................................................................21

52 U.S.C. 20507(b)(1) ...............................................15, 20, 22

52 U.S.C. 20507(b)-(g) .............................................................11

52 U.S.C. 20507(c) ............................................................14, 21

52 U.S.C. 20507(c)(1) ...............................................................17

52 U.S.C. 20507(c)(2) ...............................................................17

52 U.S.C. 20507(c)(2)(A) ....................................................14, 19

52 U.S.C. 20507(c)(2)(B) ...........................................................17

52 U.S.C. 20507(c)(2)(B)(i) ........................................................28

52 U.S.C. 20507(d) ...........................................................17, 21

52 U.S.C. 20507(f) ....................................................................17

52 U.S.C. 20507(i) ................................................................. 1-3

52 U.S.C. 20507(i)(1) ........................................................*passim*

52 U.S.C. 20507(i)(2) .................................................................25

52 U.S.C. 20508(b)(1)-(2) ..........................................................19

52 U.S.C. 20508(b)(4)(ii) ...........................................................27

52 U.S.C. 20510(a) .....................................................................1

Pub. L. No. 103-31, 107 Stat. 77 (1993) .....................................2

Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (1993)...........................24

Civil Rights Act of 1960

52 U.S.C. 20701...........................................................................23

52 U.S.C. 20703...........................................................................23

52 U.S.C. 20704...........................................................................23

Pub. L. No. 86-449, Tit. III, §§ 301, 303-304, 74 Stat. 88(1960) .................23

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 9, 103d Cong., 1st Sess. (1993) .....................................27

S. Rep. No. 6, 103d Cong., 1st Sess. (1993)................................... 23-24

**MISCELLANEOUS:** PAGE

Nat'l Clearinghouse on Election Admin., Fed. Election Comm'n,
   *Implementing the National Voter Registration Act of 1993:*
   *Requirements, Issues, Approaches, and Examples* (Jan. 1, 1994),
   https://perma.cc/Z5UL-LPBY ....................................................................24

*Webster's Third New International Dictionary* (1993) ....................................10, 26

## INTEREST OF THE UNITED STATES

The United States has a direct interest in this appeal, which raises important issues regarding the interpretation of Section 8(i) of the National Voter Registration Act (NVRA), 52 U.S.C. 20507(i). The Attorney General is charged with enforcing the NVRA, including Section 8(i), and relies on Section 8(i) to aid its enforcement efforts. 52 U.S.C. 20510(a). The United States has previously filed briefs addressing the proper interpretation and scope of Section 8(i). *See, e.g.*, U.S. Br. as Amicus Curiae, *Public Int. Legal Found. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2023), https://perma.cc/ML4S-5V4S; U.S. Br. as Amicus Curiae, *Greater Birmingham Ministries v. Secretary of State for the State of Ala.*, No. 22-13708 (11th Cir. Mar. 20, 2023), https://perma.cc/H3TR-4UNU; U.S. Br. as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), https://perma.cc/HSM3-U964. The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUE

The United States addresses the following issue only: Whether Section 8(i) requires disclosure of records relating to a State's efforts to find and remove from the rolls noncitizens who are registered to vote.

# STATEMENT OF THE CASE

## A.    Statutory Background

In 1993, Congress passed the NVRA, Pub. L. No. 103-31, 107 Stat. 77 (52 U.S.C. 20501-20511).  In so doing, Congress found that the right to vote is a fundamental right, the exercise of which all levels of government have a duty to promote, and that discriminatory and unfair registration laws and procedures can damage federal voter participation and disproportionately harm voter participation by various groups, including racial minorities.  *See* 52 U.S.C. 20501(a).

Section 8 of the NVRA, titled "[r]equirements with respect to administration of voter registration," establishes uniform procedures to increase voter registration in federal elections while maintaining accurate voter rolls.  52 U.S.C. 20507.  This case concerns Section 8(i), titled "[p]ublic disclosure of voter registration activities."  52 U.S.C. 20507(i).  Section 8(i) provides:

> (1)  Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2)  The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

*Ibid.*

## B.    The Present Controversy

a.  In 2017, Pennsylvania admitted that a software error in a computer system used by the Pennsylvania Department of Transportation (PennDOT) had made it possible for noncitizens applying for or renewing their driver's licenses to register to vote.  App. 25 (Opinion).[1]  To investigate the issue, Pennsylvania first compared PennDOT's driver records to the Statewide Uniform Registry of Electors (SURE), Pennsylvania's statewide voter registration system.  *Id.* at 26. The investigation found that approximately 100,000 registered voters had "INS indicators" on their driver records, suggesting they were, or at some previous time may have been, noncitizens.  *Id.* at 27.  Pennsylvania also searched the SURE database itself for records related to voter registrations canceled because the registrant was a noncitizen.  *Ibid.*  This second investigation found that 1160 registrations had been so canceled, all after the registrants self-reported their status and asked to be removed from the voter rolls.  *Ibid.*

Pennsylvania's Office of Chief Counsel hired outside counsel to help it address the results of the Commonwealth's investigations.  App. 28.  Outside

---

[1] "App. __" refers to the corresponding page of appellant's appendix.  "Doc. __, at __" refers to the docket entry and page number of documents filed in the district court, No. 1:19-cv-622 (M.D. Pa.).  "Sec'y Br. __" refers to the Secretary's First-Step Brief in this Court.  "PILF Br. __" refers to PILF's Second-Step Brief in this Court.

counsel analyzed the SURE database and other voting records to determine which registrants' citizenship—and hence eligibility to vote—required greater scrutiny. *Ibid.* As a result, Pennsylvania mailed 7702 letters reminding registrants of the Commonwealth's voter-eligibility requirements and 11,198 letters asking registrants to affirm their eligibility. Recipients and their responses fell into three categories: (1) those who confirmed their citizenship, whose responses Pennsylvania retained; (2) those who requested cancellation of their registration, whose requests Pennsylvania forwarded to the proper counties; and (3) nonrespondents, whose eligibility Pennsylvania notified counties of the need to investigate further. *Ibid.*

PILF, a nonprofit concerned with "the integrity of elections nationwide," sent the Pennsylvania Department of State a request in October 2017 for access to or copies of four categories of records related to these investigations. App. 25, 28 (citation omitted). PILF sought: (1) "[d]ocuments regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source," including all voter records involved in the 2017 investigations; (2) all requests to the Department of State since 2006 seeking removal or cancellation of registrations due to noncitizenship or other ineligibility; (3) all records of communications to the Department of State from jury officials since 2006 regarding requests to be excused from jury service

due to noncitizenship; and (4) all communications with law enforcement officials regarding list-maintenance activities related to PILF's other three requests. *Id.* at 28-29 (citation omitted).  The Commonwealth denied PILF's request, asserting that the "NVRA applied only to records relating to statutorily mandated removal programs, not the records sought by PILF." *Id.* at 30.

b.  PILF sued the Secretary of the Commonwealth of Pennsylvania and the Deputy Secretary for Elections and Commissions (collectively, the Secretary). Doc. 1; *see also* App. 25, 30.  The Secretary moved to dismiss, arguing again that Section 8(i) does not require disclosure of the records of its investigations into noncitizen registrants and that the Drivers Privacy Protection Act (DPPA), 18 U.S.C. 2721, separately protects the requested records.  Doc. 14, at 6-14; *see also* App. 30.  The district court held that Section 8(i) reaches the requested records, but that documents may be withheld under the DPPA "to the extent they include personal information obtained by PennDOT in connection with a motor vehicle record."  App. 30; *see also* App. 7-18.

c.  Following the district court's decision, the Secretary began to comply with PILF's requests.  App. 30.  However, PILF deemed the Secretary's responses to its requests inadequate for several reasons.  *See id.* at 34-47.  Among other things, the Secretary refused to disclose the requested records from the SURE database, asserting that Section 8(i) does not apply because database records "are

not used to update or maintain the voter rolls." *Id.* at 34.  The Secretary also withheld all documents that contained personal information derived from driver records, citing the DPPA, while PILF asserted that at most the protected personal information should be redacted and the rest of the document disclosed.  *Id.* at 36-37.

Both sides moved for summary judgment (Docs. 62, 65), and the district court granted partial summary judgment to each side (App. 24-49, 50-51).  The court held that records from the SURE database must be disclosed under Section 8(i).  App. 35-36; *see also id.* at 44-45 (requiring Secretary to un-redact voter histories, which derive from SURE database, on disclosed lists of registrants who requested removal from voter rolls citing ineligibility).  And it held that the Secretary could not withhold documents that were not entirely derived from driver records; the Secretary only could redact DPPA-protected information from them.  *Id.* at 36-37.  Similarly, the court held that the Secretary could redact certain personal information for privacy reasons but otherwise must disclose the records containing that information.  *Id.* at 37-38 & n.7.  The court also resolved other disputes over the scope of certain searches and redactions, as well as over the application of attorney-client and work product privileges for records related to the outside counsel's activities.  *Id.* at 38-47.

Though the Secretary turned over many records, he also filed a motion for clarification and partial reconsideration. Doc. 88. The district court granted the motion in part and denied it in part. App. 58. Among other things, the court reiterated that the Secretary could redact for privacy reasons "(1) Social Security numbers, (2) 'identities and personal information of those subject to criminal investigations,' and (3) personal information of citizens initially identified as potentially failing to meet the citizenship requirement for voter registration but ultimately exonerated." *Id.* at 56 n.6 (citation omitted). But it clarified that "names and addresses of individuals who responded to the letter by cancelling their voter registration, or who failed to reply to the letter or have not been confirmed to be citizens, must be disclosed." *Ibid.*

d. The Secretary timely appealed the district court's rulings. App. 59-60. His First-Step Brief repeats his argument that Section 8(i) reaches only records regarding statutorily mandated removal programs, but otherwise challenges only the district court's requirement that the Secretary disclose the identities of those who received letters after the Commonwealth's 2017 investigations. Sec'y Br. 14-15. PILF cross-appealed as to the district court's rulings shielding certain information under the work product doctrine. App. 61-62; PILF Br. 14, 62-74.

## SUMMARY OF ARGUMENT

The district court correctly held that Section 8(i) requires the Secretary to disclose the records that PILF requested.  Statutory text, context, and purpose establish that Section 8(i) covers records concerning all list-maintenance activities, including activities to remove noncitizens from the voter rolls.  The Secretary argues that Section 8(i) is limited to disclosure of records related to the voter-removal programs that the NVRA *requires* States to undertake.  But this reading gives short shrift to the far broader language that Congress chose for its disclosure provision, and to the distinctions Congress made between the scope of each provision of Section 8.  The Secretary's reading, for instance, would exclude records related to other voter removal activities that Section 8 of the NVRA expressly authorizes.  It also would remove from the NVRA's disclosure regime all records related to voter-registration activities, despite clear textual evidence that such records must be disclosed and even though their disclosure is crucial to fulfilling the NVRA's purposes.  Nor does Section 8(i)'s exception for records related to declinations to register shield from disclosure records of those who already had been registered but later requested to be removed from the voter rolls.

While States may not fully withhold records covered by Section 8(i), they may redact certain particularly sensitive information before disclosing voters'

records.  The NVRA also leaves intact state and federal laws designed to prevent

voter intimidation or other abuses.

## ARGUMENT

**The NVRA requires the Secretary to disclose records related to efforts to find and remove noncitizens from Pennsylvania's voter rolls.**

### A.    Section 8(i) covers records of investigations into noncitizen voter registration and removals of noncitizen registrants.

The district court correctly held that Section 8(i) applies to the records that

PILF sought regarding Pennsylvania's 2017 investigation and subsequent list

maintenance activities.  The NVRA's language, structure, and purpose support this

reading.  *See American C.R. Union v. Philadelphia City Comm'rs*, 872 F.3d 175,

181-183 (3d Cir. 2017) (interpreting NVRA by examining "the text of Section 8"

and the NVRA's "purpose").

1.  "As with any question of statutory interpretation, we must begin with the

statutory text."  *Khan v. Attorney Gen. of U.S.*, 979 F.3d 193, 197 (3d Cir. 2020)

(citation and internal quotation marks omitted).  Section 8(i) requires disclosure of

"all records concerning the implementation of programs and activities conducted

for the purpose of ensuring the accuracy and currency of official lists of eligible

voters."  52 U.S.C. 20507(i)(1).  The records at issue in this case—records related

to Pennsylvania's investigation into whether its voter rolls included ineligible

noncitizens—falls squarely within this language. Taking each piece of the statutory text step by step shows why.

First, Pennsylvania's investigations into whether noncitizens were registered to vote and needed to be removed from the rolls plainly at least constitute "activities," if not a "program[]," 52 U.S.C. 20507(i)(1), according to those terms' "ordinary meaning . . . at the time Congress enacted the statute," *Al-Hasani v. Secretary U.S. Dep't of Homeland Sec.*, 81 F.4th 291, 296 (3d Cir. 2023) (alteration in original) (citation omitted). A "program" is "a plan of procedure" or "schedule or system under which action may be taken toward a desired goal," while an "activity" is a "natural or normal function or operation." *Webster's Third New International Dictionary* 22, 1812 (1993). Pennsylvania's efforts meet either definition.

Pennsylvania law makes United States citizenship a qualification to register to vote, 25 Pa. Stat. and Cons. Stat. Ann. § 1301(a) (West 2023), and requires election officials to "correct an error or irregularity in registration and cancel the registration of an individual whom [they] find[] to be improperly registered," *id.* § 1203(h). This cancelation process, whenever it is conducted, "is a 'program' because it is" a plan of procedure "carried out in the service of a specified end— maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (*Project Vote*). At the least, Pennsylvania's investigation

into and removal of noncitizen registrants "is an 'activity' because it is a particular task and deed of [Pennsylvania] election employees," a normal operation for which they are responsible. *Ibid.*; *accord Public Int. Legal Found., Inc. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021) (holding that election "[b]oard's efforts . . . to identify noncitizen registrants qualify as a 'program' or 'activity' to ensure an accurate list of eligible voters").

Next, these investigative, maintenance, and removal activities are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Pennsylvania's efforts to identify and remove noncitizens from the rolls, while avoiding removing registrants who are U.S. citizens, plainly are meant to ensure that the voter rolls remain both as current and as accurate as possible. *See* Sec'y Br. 4-8 (documenting efforts); *see also* 52 U.S.C. 20507(a)(4) and (b)-(g), 21083(a)(2)(B) and (a)(4) (requiring States, under both NVRA and Help America Vote Act, to conduct continuous list maintenance activities while imposing safeguards to prevent improper removals).

Further, the records that PILF seeks are "records concerning the implementation of" covered list-maintenance programs. 52 U.S.C. 20507(i)(1). Section 8(i) extends not just to records "*of*" the implementation of programs or activities, but rather to all records "concerning" implementation. *Ibid.* (emphasis added). Like its synonym "regarding," the word "concerning" used "in a legal

context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel v. Garland*, 596 U.S. 328, 339 (2022) (citations omitted). The Secretary does not dispute that, if his investigations constitute covered activities, the records PILF seeks "concern[]"—or relate to—the "implementation" of those activities. 52 U.S.C. 20507(i)(1); *see, e.g.*, Sec'y Br. 36 (arguing only that his efforts were not covered because Section 8(i) applies solely to NVRA-mandated removal programs).

In any event, the NVRA applies its disclosure requirement to "*all*" the "records concerning the implementation of" list-maintenance programs. 52 U.S.C. 20507(i)(1) (emphasis added). "All," like the similar word "any," gives a provision "an expansive meaning," covering implementation-related records "of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted); *accord Arcos Sanchez v. Attorney Gen. of U.S.*, 997 F.3d 113, 120 & n.4 (3d Cir. 2021). "[T]he statute's use of the term 'all records' relating to [a State's] 'implementation of' the program or activity" indicates that Section 8(i) "encompasses a broad range of disclosable documents." *Public Int. Legal Found.*, 996 F.3d at 266. This includes all records concerning the removal of noncitizens from the voter rolls.

Finally, Section 8(i) only excludes two types of records from its reach: those that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered."  52 U.S.C. 20507(i)(1).  The records that PILF requests do not implicate either of these exceptions, and this Court should not manufacture a third.  *See American C.R. Union*, 872 F.3d at 182-183 (refusing to "amend" the text of Section 8 "by reading" wording "into its text" that "Congress obviously chose not to" include). "Congress explicitly enumerate[d] certain exceptions" to Section 8(i)'s disclosure mandate; the Secretary cannot invent an "additional," "implied" exception for records related to removal of noncitizens.  *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 772 n.10 (3d Cir. 2018) (citation omitted).

The only appeals court to address similar issues has read Section 8(i)'s text the same way.  In *Project Vote*, the Fourth Circuit stated that "the plain language of Section 8(i)(1) does not allow us to treat its disclosure requirement as limited to voter removal records," and held that "completed voter registration applications are clearly" covered.  682 F.3d at 335.  Following the same "statutory analysis," the Fourth Circuit later held that a State's "efforts . . . to identify noncitizen registrants" and remove them from the rolls "qualify as a 'program' or 'activity' to ensure an accurate list of eligible voters," and that records related to those efforts therefore "fall within the scope of the NVRA's disclosure provision."  *Public Int.*

*Legal Found.*, 996 F.3d at 266 (quoting 52 U.S.C. 20507(i)(1)). In that case, the

Fourth Circuit required the North Carolina State Board of Elections to release

documents to PILF that were nearly identical to the information that PILF seeks

here: the identities of individuals investigated as potential noncitizen registrants.

*Id.* at 260, 262. Though the court agreed that North Carolina could redact

particularly sensitive information, it held that the State's privacy concerns "do[]

not render the requested documents affiliated with potential noncitizens immune

from disclosure under the plain language of the NVRA." *Id.* at 267; *see* pp. 28-29,

*infra* (discussing redaction). Nor are such records immune here.

2. Statutory context further shows that Section 8(i) covers records related to

finding and removing noncitizen registrants. Congress specified throughout

Section 8 when a particular NVRA provision applies only to certain types of

removal programs or only to removals of those deemed ineligible for particular

reasons. For instance, Section 8(c), titled "[v]oter removal programs," 52 U.S.C.

20507(c), sets time limits for completing "any program the purpose of which is to

systematically remove the names of ineligible voters from the official lists of

eligible voters." 52 U.S.C. 20507(c)(2)(A). This language refers to routinized list-

maintenance processes, as compared to one-off removals. Section 8(a)(4) is even

more explicit, requiring States to implement a "general program that makes a

reasonable effort to remove the names of ineligible voters from the official lists of

eligible voters by reason of" voters' death or change of address. 52 U.S.C.

20507(a)(4). Section 8(i) contains no such limiting language—a presumptively

intentional difference. *See Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 587-588 (3d

Cir. 2020) (en banc).

    3. To the extent any "perceived ambiguity" remains, statutory purpose

"resolv[es]" it. *United States v. Smukler*, 991 F.3d 472, 483 (3d Cir. 2021)

(citations and internal quotation marks omitted). The NVRA's text enumerates the

legislation's four core purposes: increasing eligible voter registration, enhancing

voter participation, protecting electoral integrity, and maintaining accurate and

current voter registration rolls. 52 U.S.C. 20501(b). Disclosure of records related

to States' investigation of and removal of suspected noncitizen registrants would

advance all four purposes.

    Whether "voter registration rolls" are "accurate and current," 52 U.S.C.

20501(b)(4), can only be determined by examining records related to *all* the bases

on which a State removes registrants. At the same time, public inspection of

records related to removals—whatever the reason for them—ensures that States are

engaging in uniform and nondiscriminatory list-maintenance practices. *See* 52

U.S.C. 20507(b)(1). Identifying errors in States' voter registration systems

promotes a smoother registration process, which is vital to "enhanc[ing]" voter

"participation," while also "protect[ing] the integrity of the electoral process" by

ensuring that ineligible individuals are excluded from the rolls.  *See* 52 U.S.C. 20501(b)(2)-(3).  Plus inspection of all registration and list-maintenance records helps to uncover systemic problems in a jurisdiction, so voters or organizations can remedy registration or list-maintenance issues and re-register improperly removed voters before future elections.  *See, e.g.*, *Project Vote*, 682 F.3d at 333; *see also* 52 U.S.C. 20501(b)(1)-(2).  Public disclosure of the records of the Secretary's investigation thus advances the NVRA's central purposes.

**B.    The Secretary's restrictive view of Section 8(i) conflicts with Section 8(i)'s text, context, and purpose.**

The Secretary's alternative reading of Section 8(i) misreads its text and would remove from its reach many records vital to fulfilling the NVRA's purposes. Section 8(i) is not limited to records related to the NVRA's mandatory voter-removal programs.  Nor does Section 8(i) exempt records of those who canceled their registrations in response to the Commonwealth's investigation.

**1.    Section 8(i) applies beyond records related to Section 8(a)(4) removal programs.**

a.  The Secretary principally contends (Br. 25-32) that Section 8(i) only applies to the mandatory, systematic programs that Section 8(a)(4) requires States to undertake to remove voters ineligible due to death or change of residence.  *See* 52 U.S.C. 20507(a)(4).  Section 8(i) does not apply here, the Secretary says (Br.

31-32), because the NVRA does not similarly require States to remove noncitizens from the rolls.

But Section 8(i)'s text cannot be read to tether disclosure to Section 8(a)(4) programs alone. "If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). Congress knows how to cross-reference statutory provisions. It could have limited disclosure to records of "the list-maintenance programs described in subsection (a)(4)." Indeed, Congress did just this in Section 8(c), laying out how "[a] State may meet the requirement of subsection (a)(4)." 52 U.S.C. 20507(c)(1); *see also* 52 U.S.C. 20507(c)(2)(B) (expressly referencing other provisions of Section 8 by stating that a prior subparagraph "shall not be construed to preclude" removing names from voter lists "on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a)"). Or Congress could have employed language like that used in Subsection (a)(4) itself, limiting Section 8(i) to records concerning efforts to remove people from the voter rolls due to "death" or "change in" their "residence." 52 U.S.C. 20507(a)(4). Congress even could have drafted language like that used in other provisions of Section 8 that similarly limit themselves to particular list-maintenance processes. *E.g.*, 52 U.S.C. 20507(c)(2), (d) and (f).

Instead, Section 8(i) uses general language, applying to *all* records concerning implementation of programs "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). "Where Congress used specific language in one part of a statute but different language in another, we presume different meanings were intended." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 554 (3d Cir. 2017). Far from suggesting that Section 8(i) applies only to the same "program" required by Section 8(a)(4) (*contra* Sec'y Br. 31), Congress's drafting choices indicate that different provisions of Section 8 apply to different subsets of registration or list-maintenance "programs."

Section 8(i) also reaches "activities," 52 U.S.C. 20507(i)(1), a word that "suggests great breadth," *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998). Yet in the Secretary's telling (Br. 31-32), Section 8(i) does not even apply to "programs" beyond the removal programs Section 8(a)(4) mandates, much less to more individualized "activities." For instance, it would exclude records of removals made "at the request of the registrant," or (when state law allows) because of "criminal conviction or mental incapacity," even though Section 8(a)(3) of the NVRA expressly authorizes States to engage in these efforts. 52 U.S.C. 20507(a)(3). The Secretary's reading of Section 8(i) would thereby render the words "and activities" superfluous—violating the "cardinal principle of statutory

construction that we must give effect, if possible, to every clause and word of a statute." *Khan*, 979 F.3d at 199 (citation omitted).

b.  Moreover, the Secretary's interpretation would cut out of the statute all records related to voter registration programs and activities, even though "the unambiguous text of Section 8," *American C.R. Union*, 872 F.3d at 181, as well as the NVRA's purposes confirm that Section 8(i) covers such records.

i.  Voter registration programs and activities, like list-maintenance activities, are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). After all, "voter lists are not 'accurate' or 'current' if eligible voters have been improperly denied registration or if ineligible persons have been added to the rolls." *Project Vote*, 682 F.3d at 335. Reviewing voter registration applications and updating voter registration lists accordingly ensures that the voter rolls as a whole remain correct and up-to-date. Congress acknowledged as much in the NVRA itself. It instituted several new mandatory voter registration methods, 52 U.S.C. 20504-20506, and required voter registration forms to ask for the information (but only the information) needed to enable officials to "assess the eligibility of the applicant," 52 U.S.C. 20504(c)(2)(B)(ii) and (c)(2)(C), 20508(b)(1)-(2). And Congress further emphasized these purposes in passing HAVA: It required all States to develop statewide electronic voter databases, and mandated that election officials "verify

- 19 -

the accuracy" of applicants' information and enter voters' information into the

statewide list "on an expedited basis," so that States would always have an

accurate and up-to-date list.  52 U.S.C. 21083(a)(1)(A)(vi) and (a)(5)(B)(i).

Records concerning these activities, then, fall within Section 8(i).

The Secretary's reading of Section 8(i) also fails to take account of the

provision's two express exceptions, those for information concerning declinations

to register and the agency of registration.  52 U.S.C. 20507(i)(1).  Both exemptions

relate to initial voter registration activities, indicating that Section 8(i) otherwise

applies to registration-related records.  Under the Secretary's list-maintenance-only

reading, by contrast, records related to declinations to register and the agency of

registration "would have *already* been impliedly exempt from [disclosure],

rendering superfluous [Section 8(i)]'s express exemptions for them."  *Mercy Cath.*

*Med. Ctr.*, 850 F.3d at 554.

ii.  Context, too, indicates that Section 8(i) applies to voter registration

activities, not just to systematic voter removal programs.  Start with the relevant

statutory titles, which "are 'permissible indicators of meaning.'"  *United States v.*

*Bryant*, 996 F.3d 1243, 1258 (11th Cir.) (citation omitted), *cert. denied*, 142 S. Ct.

583 (2021).  Section 8(i) is titled "[p]ublic disclosure of voter *registration*

activities," 52 U.S.C. 20507(i) (emphasis added), and falls within a section titled

"[r]equirements with respect to administration of voter *registration*," 52 U.S.C.

20507 (emphasis added).  "These statutory labels reinforce the conclusion that Section 8(i)(1) governs voter registration records." *Project Vote*, 682 F.3d at 337. When Congress sought to reference only efforts to remove voters from the rolls, it titled those provisions accordingly. *Compare, e.g.*, 52 U.S.C. 20507(c) ("Voter removal programs") and 52 U.S.C. 20507(d) ("Removal of names from voting rolls"), *with* 52 U.S.C. 20507(b) ("Confirmation of voter registration").

Congress made this distinction equally clear in the text of the provisions themselves.  For instance, Section 8(a)(4) speaks of efforts "to *remove* the names of ineligible voters from the official lists of eligible voters" for particular reasons. 52 U.S.C. 20507(a)(4) (emphasis added).  But Section 8(a) also includes provisions that regulate "the administration of voter registration."  52 U.S.C. 20507(a); *see* 52 U.S.C. 20507(a)(1) and (a)(5)(A) (mandating measures to "inform applicants" of "voter eligibility requirements" and "ensure that any eligible applicant is registered to vote").  And in some provisions, Congress addressed registration and list-maintenance efforts at once.  Section 8(b), for instance, does this by setting standards for "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office."  52 U.S.C. 20507(b).  This language, like Section 8(i)'s, applies across-the-board to activities designed to "ensur[e] the accuracy and currency of official lists of eligible voters."  52 U.S.C.

20507(i)(1).  Such activities include both registering voters and removing voters, whatever the reason.  *See Project Vote*, 682 F.3d at 335.

iii.  The Secretary's crabbed interpretation of Section 8(i) also would frustrate Congress's purposes in enacting the NVRA, leaving States' voter-registration activities entirely immune from the public scrutiny that Congress drafted Section 8(i) to provide.  Public inspection of registration-related records can help ensure that States are properly evaluating applications, rejecting applicants only for legitimate reasons, processing eligible applications in a timely fashion, and engaging in uniform and nondiscriminatory registration practices. *See, e.g.*, 52 U.S.C. 20504(e); 52 U.S.C. 20506(d); 52 U.S.C. 20507(a)(1) and (b)(1).  The Secretary's reading would prevent the public from monitoring whether States are meeting any of these NVRA-mandated standards.  This despite Congress's intent—expressed in the NVRA's text—to ensure that States "increase the number of eligible citizens who register to vote" and "implement [the law] in a manner that enhances the participation of eligible citizens."  52 U.S.C. 20501(b)(1)-(2).

c.  The Secretary also suggests (Br. 35-36) that a broader reading of Section 8(i) would be nonsensical, because it would give the public greater access to records than the Attorney General under the NVRA.  This is wrong on three levels. First, the provisions that the Secretary mistakenly cites as providing the Attorney

General with disclosure rights "under the NVRA" (*id.* at 35) actually were passed as part of the Civil Rights Act of 1960. *See* Pub. L. No. 86-449, Tit. III, §§ 301, 303-304, 74 Stat. 88 (52 U.S.C. 20701, 20703-20704). The Attorney General has the same disclosure, use, and dissemination rights under the NVRA as any other member of the "public." 52 U.S.C. 20507(i)(1).

Second, the public's rights under the NVRA are not uniformly broader than the Attorney General's under the Civil Rights Act. While the latter does limit the Attorney General's ability to disseminate the records it requires States to disclose, *see* 52 U.S.C. 20704, it also mandates disclosure of records that "relat[e] to" voter "registration" or "other act[s] requisite to voting" but that would fall outside Section 8(i)'s reach or within one of Section 8(i)'s exceptions, 52 U.S.C. 20701.

And third, to the extent that the NVRA authorizes broader dissemination rights than did the Civil Rights Act of 1960, that distinction merely shows that different Congresses balanced differently in each statute the benefits of transparency and the costs of reduced privacy. When Congress passed the NVRA, it had more than three decades of experience with the benefits and drawbacks of the Civil Rights Act's disclosure provision—and in between it had enacted numerous other sunshine laws of varying scopes, like the Freedom of Information Act and the Federal Advisory Committee Act. With that knowledge, Congress debated the extent to which it would restrict disclosure under Section 8(i), *see* S.

Rep. No. 6, 103d Cong., 1st Sess. 40 (1993), and settled on just the two narrow

categorical exceptions that it listed in Section 8(i)(1), *see* 52 U.S.C. 20507(i)(1).

d.  Finally, the Secretary points (Br. 29 n.7) to a 1994 FEC guidance

document.  This document discusses Section 8(i)(2)'s express examples of

disclosable records; it then says that States might also wish to retain "for the same

period of time all records of removals from the voter registration list," but "[a]s a

matter of prudence, . . . not as a requirement of the Act."  National Clearinghouse

on Election Admin., Fed. Election Comm'n, *Implementing the National Voter*

*Registration Act of 1993:  Requirements, Issues, Approaches, and Examples* 7-1

(Jan. 1, 1994), https://perma.cc/Z5UL-LPBY.

This statement cannot sustain the Secretary's interpretation of Section 8(i).

For one thing, the FEC never had general authority to administer or interpret the

NVRA, and the FEC's limited rulemaking authority never extended to the

NVRA's public disclosure provision.  *See* Pub. L. No. 103-31, § 9(a), 107 Stat. 87

(as amended 52 U.S.C. 20508(a)); *contra* Sec'y Br. 42.  Hence, as the guidance

document itself notes, the FEC "d[id] *not* have legal authority either to interpret the

Act or to determine whether this or that procedure meets [its] requirements"; its

suggestions were "offered without force of law, regulation, or advisory opinion."

National Clearinghouse on Elec. Admin. at P-1; *see United States v. Mead Corp.*,

533 U.S. 218, 231-232 (2001).  And the FEC has had no role at all under the

NVRA for over two decades:  HAVA transferred the FEC's functions and powers under the NVRA to the Election Assistance Commission in 2002.  *See* Pub. L. No. 107-252, § 802, 116 Stat. 1726 (52 U.S.C. 20508(a)).

For another, the statement's placement after discussion of Section 8(i)(2) suggests that the FEC may have believed that *only* those records specified in Section 8(i)(2) must be retained and disclosed.  Section 8(i), however, is not limited to Section 8(i)(2)'s examples.  Section 8(i)(2) states that "[t]he records maintained pursuant to paragraph (1) shall *include*" the enumerated records.  52 U.S.C. 20507(i)(2) (emphasis added).  The word "include[]" "makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive." *Marmon Coal Co. v. Director, Off. of Workers' Comp. Programs*, 726 F.3d 387, 393 (3d Cir. 2013) (citation omitted).  Section 8(i)(2), then, does not exclude other records; it merely "describes" certain "set[s] of records that must be" created and "maintained."  *Project Vote*, 682 F.3d at 337.  Tellingly, not even the Secretary reads Section 8(i) as narrowly as the FEC apparently did.

In the end, however, the document gives no rationale for the statement upon which the Secretary relies.  And it is the statute's clear language that ultimately controls.  *See Port Hamilton Refin. & Transp., LLLP v. United States EPA*, 75 F.4th 166, 172 (3d Cir. 2023); *Mercy Cath. Med. Ctr. v. Thompson*, 380 F.3d 142, 152 (3d Cir. 2004).

## 2.    Section 8(i) requires release of records related to those who responded to Pennsylvania's inquiries by canceling their registrations.

The Secretary also asserts (Br. 38) that he need not disclose the names and addresses of those who requested to cancel their registrations because they fall within Section 8(i)'s exception for records related to "declinations to register." However, that statutory exemption does not apply here.  The phrase "declination to register," 52 U.S.C. 20507(i)(1), refers to someone who is offered the opportunity to register under the NVRA's registration provisions but declines, rather than someone who is already on the voter rolls and then asks to be taken off.

Start with the contemporary "ordinary meaning" of the statutory term.  *Al-Hasani*, 81 F.4th at 296.  A "declination" means "a formal refusal: nonacceptance."  *Webster's Third New International Dictionary* 586.  A declination to register, then, means a refusal of an offer to register to vote.  Those who request to be removed from the rolls after already registering are not refusing, or deciding not to accept, an offer to register.

The rest of the NVRA buttresses this understanding of the declination exception.  Each of the NVRA's voter registration provisions requires voter registration forms to state that "if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes."  52 U.S.C. 20504(c)(2)(D)(ii); *accord* 52

U.S.C. 20506(a)(7) and 20508(b)(4)(ii); *see also* 52 U.S.C. 20505(a) (requiring

States to use mail registration forms meeting requirements of 52 U.S.C. 20508(b)).

Section 7, which governs registration at designated agencies, even uses the same

phrase as Section 8(i): "a declination to register." 52 U.S.C. 20506(a)(6)(B)(iii)

and (a)(7).[2] "Generally, 'a statutory phrase must have a fixed meaning across a

statute.'" *Garrett v. Murphy*, 17 F.4th 419, 431 (3d Cir. 2021) (citation omitted).

Like the NVRA's registration provisions, then, Section 8(i)'s reference to "a

declination to register" denotes an applicant's decision not to register in the first

place. 52 U.S.C. 20507(i)(1); *see also* H.R. Rep. No. 9, 103d Cong., 1st Sess. 19

(1993) (explaining ties between declination exception and NVRA's registration

provisions).

Other NVRA provisions separately address the removal of registrants,

including at their own request. Section 8(a) provides that "the name of a registrant

may not be removed from the official list of eligible voters except," among other

things, "at the request of the registrant." 52 U.S.C. 20507(a)(3)(A). Section

---

[2] Congress ensured that declinations to register will generate records that would be subject to Section 8(i)'s disclosure mandate but for Section 8(i)(1)'s express exemption. Congress required that all applications or renewal forms for public assistance contain a voter registration form along with a form with "boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote." 52 U.S.C. 20506(a)(6)(A) and (B)(iii). Likewise, it required States to include voter registration forms—which voters could decline to complete—as part of all driver's license applications. 52 U.S.C. 20504(c)(1).

8(c)(2) then requires systematic removal efforts to end 90 days before an election, but exempts removals "on a basis described in paragraph (3)(A) . . . of subsection (a)"—in other words, registrants' requests to be removed.  52 U.S.C. 20507(c)(2)(B)(i).  The records of those canceling their registrations in response to Pennsylvania's investigation thus relate to those sorts of *removal requests*, not to *declinations to register*.  The Secretary cannot use an inapplicable exception to shield from disclosure the names and addresses of those requesting to cancel their registration.

### C.    States may redact certain information before disclosing Section 8(i) records.

Aside from the two categories of records that its text expressly excludes, Section 8(i) does not allow States to fully withhold records that fall within its reach.  *See* 52 U.S.C. 20507(i)(1).

However, as the United States has noted in prior cases, the NVRA does not prohibit the *redaction* of highly sensitive information within those records, or information whose disclosure would violate other federal laws.  *See, e.g.*, U.S. Br. as Amicus Curiae at 27-28, *Public Int. Legal Found. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2023), https://perma.cc/ML4S-5V4S; U.S. Br. as Amicus Curiae at 24-26, *Project Vote*, 682 F.3d 331 (No. 11-1809), https://perma.cc/HSM3-U964; *see also Public Int. Legal Found., Inc.*, 996 F.3d at 259 (remanding to district court to allow for redaction of (1) "sensitive information vulnerable to abuse"—

including "the identities and personal information of" those subject to criminal investigations and "those who later were determined to be United States citizens" after being investigated for noncitizenship—and (2) information protected by the DPPA or other applicable statutes).  Nor does it allow requestors to disseminate disclosed information with the purpose or effect of harming voters—activity that voter-intimidation and tort laws separately prohibit.  *See* U.S. Br. as Amicus Curiae at 28-30, *Bellows*, *supra* (No. 23-1361).  PILF is right to acknowledge (Br. 57, 59-60) these limits on disclosure rights but wrong to claim (Br. 56) that disclosures of personally identifiable information are "imaginary threats."[3]

---

[3] The United States takes no position on what information can or must be redacted from the documents that Section 8(i) requires to be disclosed in this case.

## CONCLUSION

This Court should affirm on the issue addressed herein.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(a), I hereby certify that I am

exempt from the Third Circuit's bar admission requirement as counsel representing

the United States.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
    Attorney

Date:  November 6, 2023

# CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE-CROSS-APPELLANT URGING AFFIRMANCE ON THE ISSUE ADDRESSED HEREIN:

(1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6464 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f);

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365, in 14-point Times New Roman font; and

(3) complies with the requirements of Local Rule 31.1(c) that the text of the electronic brief is identical to the text in any paper copies of this brief that are submitted to the Court, and that the electronic version of this brief, prepared for submission via ECF, has been scanned with Crowdstrike Endpoint Detection and Response Version 7.1.1713.0 and is virus-free according to that program.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  November 6, 2023

# CERTIFICATE OF SERVICE

I certify that on November 6, 2023, I electronically filed the foregoing

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF

PLAINTIFF-APPELLEE-CROSS-APPELLANT URGING AFFIRMANCE ON

THE ISSUE ADDRESSED HEREIN with the Clerk of the Court for the United

States Court of Appeals for the Third Circuit by using the appellate CM/ECF

system.  I also certify that on November 6, 2023, seven (7) paper copies, identical

to the brief filed electronically, were sent to the Clerk of the Court by Federal

Express.

I certify that all participants in this case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
  Attorney
