No. 23-1590 & No. 23-1591

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

THE PUBLIC INTEREST LEGAL FOUNDATION,

Appellee/Cross-Appellant,

v.

AL SCHMIDT, in his official capacity as SECRETARY
OF THE COMMONWEALTH OF PENNSYLVANIA,

and

JONATHAN M. MARKS, in his official capacity as DEPUTY
SECRETARY FOR ELECTIONS AND COMMISSIONS,

Appellants/Cross-Appellees.

_____

Appeal From Final Order Entered by U.S. District
Court for the Middle District of Pennsylvania in Case
No. 1:19-CV-622

_____

_____

BRIEF OF LAWYERS DEMOCRACY FUND AS AMICUS CURIAE
IN SUPPORT OF APPELLEE/CROSS-APPELLANT

_____

Jonathon Paul Hauenschild
Lawyers Democracy Fund
4201 Wilson Blvd., Suite 110-315
Arlington, VA 22203
(202) 441-5487

*Attorney for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. Proc. 26.1 and 29 and Local Rule App. Proc. 26.1, Lawyers Democracy Fund ("LDF") has no financial interest in this case. LDF is a non-profit, 501(c)(4) organization. It is not a publicly held corporation, has no parent companies or subsidiaries, and it neither owns, nor is owned by, any of the parties in this case.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ………………………..………………………..iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT .........................................................................................................5

   I.   Congress Drew on Different Constitutional Authorities to Create the NVRA and DPPA. ...................................................................................................5

   II.   The NVRA and DPPA Do Not Conflict and Can Be Applied Harmoniously Because Pennsylvania Requires Citizenship Information Only For Determining Voter Eligibility (Not for Motor Vehicle Purposes). ...................7

   III.   Congress Presumed DMVs Would Create Two Simultaneous Records For Driver's Licenses and Voter Registration Applications. ..................................14

   IV.   The DPPA Protects Privacy In A Limited Set of "Motor Vehicle Records" And Does Not Countermand The NVRA's Disclosure Requirements For "Voter Registration" Records. .......................................................................19

CONCLUSION .....................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013)....................................................................6, 7, 15, 17

*Davis v. Freedom of Information Comm'n*,
   259 Conn. 45 (2001) ......................................................................16

*Ill. Conservative Union v. Illinois*,
   No. 20-C-5542, 2021 WL 2206159 (N.D. Ill. June 1, 2021) ...........18

*Judicial Watch, Inc. v. Lamone*,
   399 F.Supp.3d 425 (D. Md. 2019).................................................18

*Maracich v. Spears*,
   570 U.S. 48 (2013)....................................................................20, 22

*Pan-Atl. S.S. Corp. v. Atl. Coast Line R. Co.*,
   353 U.S. 436 (1957)........................................................................7

*Pennsylvania v. Dep't of Health & Human Servs.*,
   723 F.2d 1114 (3rd Cir. 1983) ........................................................7

*Perrotta v. Commonwealth*,
   110 A.3d 255 (Pa. Cmwlth Ct. 2015) ............................................11

*Pichler v. UNITE*,
   542 F.3d 380 (3d Cir. 2016) .........................................................19

*Project Vote v. Kemp*,
   208 F.Supp.3d 1320 (N.D. Ga. 2016).............................................18

*Project Vote/Voting for Am., Inc. v. Long*,
   682 F.3d 331 (4th Cir. 2012) ...............................................15, 18, 23

*Pub. Int. Legal Found. v. Bellows*,
   No. 1:20-cv-00061-GZS, 2023 WL 2663827 (D. Me. Mar. 28,
   2023) .........................................................................................18

*Pub. Int. Legal Found. v. Boockvar*,
  431 F.Supp.3d 553 (M.D. Pa. 2019) ....................................5, 19, 22, 23

*Pub. Int. Legal Found. v. Dahlstrom*,
  No. 1:22-cv-00001-SLG, 2023 WL 3498044 (D. Alaska May 17,
  2023) ..............................................................................................18

*Pub. Int. Legal Found. v. Matthews*,
  589 F.Supp.3d 932 (C.D. Ill. 2022) ...................................................18

*Reno v. Condon*,
  528 U.S. 141 (2000)...............................................................*passim*

*Senne v. Village of Palatine, Ill*,
  695 F.3d 597 (7th Cir. 2012) ............................................................20

*United States v. Lopez*,
  514 U.S. 549 (1995)...........................................................................6

**Statutes**

25 Pa.C.S. § 1222 .........................................................................13, 17

25 Pa. C.S. § 1301(a) ...............................................................10, 13, 17

25 Pa.C.S. § 1323 .........................................................................13, 14

25 Pa.C.S. § 1327 ................................................................................13

75 Pa.C.S. § 1510(a) .......................................................................11, 12

18 U.S.C. § 2725(1) .........................................................................9, 16

Drivers Privacy Protection Act, Pub. L. No. 103-322 §§ 30001-03,
  108 Stat. 2099 (1994) (codified at 18 U.S.C. 2721) ....................*passim*

Help America Vote Act, Pub. Law No. 107-252, 116 Stat. 1666 §§
  303(b)(4)(A)(i), 905 (2002) ..............................................................11

National Voter Registration Act, Pub. L. No. 103-31, 107 Stat. 77
  (1993) (codfied at 52 U.S.C. § 20501) ........................................*passim*

Violent Crime Control and Law Enforcement Act of 1994, Pub. L.
  No. 103-322, 108 Stat. 1796 ..............................................................7

Voting Rights Act of 1965, Pub. Law No. 89-110, 79 Stat. 437 ............................11

**Other Authorities**

4 Pa. Code § 183.4(b)(8) ............................................................14

4 Pa. Code § 183.12 ..................................................................14

67 Pa. Code § 73.3 ...................................................................12

67 Pa. Code § 91.4(b) ...............................................................12

A. Karras, THE CONSTITUTIONALITY OF THE DRIVER'S PRIVACY
    PROTECTION ACT: A FORK IN THE INFORMATION ACCESS ROAD, 52
    *Fed. Comm. L. J.* 125 (1999) ..............................................19, 20, 21

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF
    LEGAL TEXTS (2012) ...........................................................8

Electronic Privacy Information Center (EPIC), *The Drivers Privacy
    Protection Act (DPPA) and the Privacy of Your State Motor
    Vehicle Record,* available at https://epic.org/dppa/ ...........................20

Federalist No. 52 (J. Madison) ......................................................17

Federalist No. 60 (A Hamilton) .....................................................17

P. Jacobs, *Addresses at DMV Remain Accessible: Privacy: New Rules
    Were Written to Keep Information Confidential. Critics Say There
    Are Too Many Loopholes*, L.A. TIMES (Aug. 19, 1991), available at
    https://www.latimes.com/archives/la-xpm-1991-08-19-mn-608-
    story.html ...................................................................20

U.S. Const. amend. X ...............................................................21

U.S. Const. amend. XI ..............................................................21

U.S. Const. amend. XV ..............................................................10

U.S. Const. Art. I, § 4, cl. 1 ......................................................5

U.S. Const. Art. I, § 8, cl. 3 ......................................................6

*With*, Merriam-Webster (2023), available at https://www.merriam-webster.com/dictionary/with...................................................................9

## **IDENTITY AND INTEREST OF AMICUS CURIAE**

Lawyers Democracy Fund ("LDF") is a social welfare organization that promotes ethics and legal professionalism in the electoral process. LDF seeks to ensure that all citizens are able to exercise their right to vote and that reasonable, common-sense administrative processes and protections may be implemented to (a) prevent the dilution of any citizen's vote or disenfranchisement as a result of administrative error or fraud and (b) instill public confidence in election procedures and outcomes.

LDF primarily conducts, funds, and publishes research and in-depth analyses regarding the effectiveness of current and proposed election methods, particularly those lacking adequate coverage in the national media. LDF also has a history of supporting efforts to increase transparency related to government voter registration database accuracy and maintenance. LDF relies upon the kind of voter registration information requested by the Public Interest Legal Foundation ("PILF") in Pennsylvania to analyze elections and develop constructive election administration policies. LDF periodically engages in public interest litigation to uphold the rule of law and integrity in elections and files briefs as amicus curiae in cases where its background, expertise, and national perspective in the field of election law may help illuminate important points for consideration.

## **INTRODUCTION AND SUMMARY OF ARGUMENT**

This case calls upon the Court to recognize subtle but significant distinctions between congressionally mandated disclosure of "voter registration" information and congressionally mandated privacy for driver's licensing and motor vehicle registrations collected by a single state agency but distributed and used by completely different state agencies for different purposes. Congress recognized the difference between public accountability and transparency in our election administration, on the one hand, and protecting personal information of drivers and car owners from improper disclosure by state departments of motor vehicles—a distinction the trial court properly analyzed and applied.

The National Voter Registration Act (NVRA) requires states to permit voter registration through department of motor vehicle (DMV) driver's license application forms. The NVRA requires a state DMV to transmit certain information to a state election official so the official can determine whether an applicant is an eligible voter. Among the transparency and accountability requirements in the NVRA, Congress allowed third parties access to certain election official practices including how (or whether) an official maintains voter registration databases, how officials ensure ineligible voters are removed, and how officials determine whether applicants are eligible.

When crafting the NVRA, Congress understood that it was commandeering state DMVs to perform an additional role—register voters. In performing two roles, Congress understood that state DMVs would simultaneously create two distinct sets of records: One for the DMV's use to administer driver's licenses and one for use by state election officials to administer voter registrations. Accordingly, throughout the NVRA, Congress referred to the simultaneous creation of different records, limited the type of information that may be transmitted to the election officials, and required the transmission of certain other information to election officials for voter registration purposes. It also allowed for third party groups to access the voter registration records necessary for use by elections officials. Among the categories of information Congress required to be transmitted to election officials is that related to eligibility. Data about citizenship is expressly included, as federal law (including the NVRA) limits the franchise to "eligible citizens" for purposes of federal elections.

The Drivers Privacy Protection Act (DPPA) prohibits state departments of motor vehicles from disclosing the personal information they collect in connection with administering "motor vehicle records," which the statute narrowly defines as a record pertaining to a motor vehicle operator's permit, motor vehicle title or registration, or a driver's identification card. The prohibition, though, is not absolute as Congress created statutory exceptions permitting disclosure in certain

circumstances, which includes exceptions for fulfilling important government functions and in response to court orders. And by its express terms the statute's restrictions apply solely to a state's department of motor vehicles, not other state agencies.

The same Congress that crafted the NVRA crafted the DPPA. That Congress would not pass two laws where the effect of one nullifies provisions of the other. Congress clearly was addressing two distinct sets of records, albeit with overlapping information. Courts can give both statutes full effect to fulfill their respective purposes without damaging either statute. To the extent that any balancing may be required, the trial court properly concluded that Congress itself balanced the concerns, permitting disclosure of information to PILF.

Previous decisions through the course of this litigation have presumed that courts must apply and construe both the NVRA and DPPA. When looking at the context of the NVRA, such an application of both laws may not be necessary because Congress in the NVRA presumed the simultaneous creation of driver and vehicle records for use by DMVs and voter registration records for use by election offices— and provided for the disclosure of voter registration records to third parties.

After briefly looking at the jurisprudence of statutory construction and application, this brief will examine the text and history of the NVRA, and the purpose and history of the DPPA. It will explain that the NVRA and DPPA are

completely consistent with each other and can both be fully applied without interfering with the rights conferred by the other. Based on the text of the NVRA and Pennsylvania law, though, courts need not balance the two laws, as the NVRA controls the disclosure of "voter registration" records. The text of the DPPA limits its coverage to a limited class of "motor vehicle" records pertaining to driver licenses and vehicle registrations—which are not the subject of PILF's request.

## ARGUMENT

### I.   Congress Drew on Different Constitutional Authorities to Create the NVRA and DPPA.

The tension between the NVRA and DPPA, to the extent it exists, may partially be explained by the different provisions of the Constitution upon which both are based. Congress enacted the NVRA pursuant to the Elections Clause while it enacted the DPPA pursuant to the Commerce Clause. As explained below, the two provisions are not at odds with each other. Though, the failure to distinguish between the sources of authority led at least one court to reach the wrong conclusion about what type of records a state may refuse to disclose in *Public Interest Legal Foundation v. Boockvar*, 431 F.Supp.3d 553 (M.D. Pa. 2019).

The Elections Clause provides, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of [choosing] Senators." U.S. Const. Art. I, § 4,

cl. 1. The Clause imposes upon States "the duty [] to prescribe the time, place, and manner of electing Representatives and Senators [and] upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013).

Congress enacted the DPPA pursuant to its authority to regulate interstate commerce. The Constitution provides that "Congress shall have power … [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. As discussed in *United States v. Lopez*, 514 U.S. 549 (1995), when Congress exercises its authority under the Commerce Clause, the regulation must somehow relate to "commercial intercourse" among the States. *Id*. at 553, *quoting Gibbons v. Ogden*, 22 U.S. 1 (1824). According to the Supreme Court, Congress properly exercised its Commerce Clause authority to enact the DPPA because, by regulating the sale and release of personal, identifying information, the law "regulate[d] a 'thing in interstate commerce[.]'" *Reno v. Condon*, 528 U.S. 141, 148 (2000).

When courts analyze challenges to laws under the Commerce Clause, they must first look to whether the law regulates "a thing in interstate commerce." When they analyze whether laws enacted under the Elections Clause are valid, the only question really is whether it is a lawful exercise of the Elections Clause. When Congress acts pursuant to the Elections Clause, such legislation "*necessarily*

displaces some element of a pre-existing legal regime erected by the state." *Arizona*,

570 U.S. at 14 (emphasis original).

When tension between two statutes is suggested by a litigant, the first question

a court should ask is whether tension really exists or has been conjured by one of the

litigants. In this case, amicus respectfully suggests that the Commonwealth

manufactured the tension in the early stages of this litigation. Before 2019, no court

thought of applying the DPPA motor vehicle record provisions to NVRA voter

registration disclosure requests, especially where a plaintiff sought information

related to citizenship determinations used solely for voter registration purposes.

## II.    The NVRA and DPPA Do Not Conflict and Can Be Applied Harmoniously Because Pennsylvania Requires Citizenship Information Only For Determining Voter Eligibility (Not for Motor Vehicle Purposes).

Even assuming, *arguendo*, that the DPPA and NVRA were in tension (they are

not), courts should then ask whether they can give full effect to both. *Pennsylvania*

*v. Dep't of Health & Human Servs.*, 723 F.2d 1114, 1119 (3rd Cir. 1983), *citing*

*Morton v. Mancari*, 417 U.S. 535 (1974). While the Harmonious-Reading Canon is

usually applied to inconsistencies within a statute, it can be applied to different laws,

especially those enacted by the same Congress.[1] According to the late Justice

Antonin Scalia and Bryan Garner, the Harmonious-Reading Canon suggests that

---

[1] *See Pan-Atl. S.S. Corp. v. Atl. Coast Line R. Co.*, 353 U.S. 436 (1957) (interpreting the Interstate Commerce Act and the Administrative Procedure Act to ensure harmonious reading of both statutes). The 103rd Congress is responsible for both the NVRA and DPPA, with the NVRA enacted as Pub. L. No. 103-31, 107 Stat. 77 (1993) and the DPPA originally enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796.

courts should interpret provisions "in a way that renders them compatible, not contradictory" because courts should presume that "intelligent drafters do not contradict themselves." *See* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012), § 27, p. 180.

A harmonious reading of both the NVRA and DPPA would entitle PILF to records of programs used by the Commonwealth to ensure the accuracy and currency of official lists of eligible voters, even though the information was initially processed by the DMV and transferred to election offices. The NVRA contemplates the simultaneous creation of both voter records and driver's license records and provides for the transmission of necessary information from the DMV to election officials to "assess the eligibility of the applicant." 52 U.S.C. §§ 20504(c)(2)(B)(ii), 20504(e), 20507(a)(1)(A). It also allows for other forms of voter registration, including through the mail and at voter registration agencies. *Id.* §§ 20505, 20506. Meanwhile, the DPPA prohibits the disclosure of personal information obtained by DMVs in connection with "motor vehicle records," which is different than the citizenship information collected for voter registration purposes.

The definitions of motor vehicle records differ in material respects between the two laws, and not in a way that creates inherent conflict. In the NVRA, Congress defined "motor vehicle driver's license" to include "any personal identification *document* issued by a State motor vehicle authority"—that is, a driver's license or

photo identification card. *Id*. § 20502(3) (emphasis added). In the DPPA, Congress defined a "motor vehicle record" as "any *record* that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a [DMV]." 18 U.S.C. §§ 2721(a), 2725(1) (emphasis added). There is a clear distinction between the driver's license to operate a car and citizenship information collected for qualifying voter registrations.

In the NVRA, 52 U.S.C. § 20507(a)(1)(A),[2] Congress uses the term "registration with a motor vehicle application," rather than employing the "motor vehicle driver's license" term defined in the statute. This, in combination with the common meaning of "with" to "indicate combination, accompaniment, presence, or addition," indicates Congress understood it was assigning two distinct duties to DMV offices—driver licensing and voter registration—and thereby providing for the creation of two distinct, simultaneous sets of records. *See With*, Merriam-Webster (2023), available at https://www.merriam-webster.com/dictionary/with. Indeed, states objected to the federal imposition of the additional duty upon their motor vehicle offices. *See, e.g.*, *Reno*, 528 U.S. at 148. To make registering through the DMV as convenient as possible, Congress prohibited DMVs from requiring more

---

[2] "In the administration of voter registration for elections for Federal Office, each State shall ensure that any eligible applicant is registered to vote in an election; in the case of *registration* with a motor vehicle application under section 5, if the valid *voter registration form* of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the election." (Emphasis added.)

information than necessary to determine eligibility, which for purposes of federal elections would include age, citizenship, and address.

Any superficial tension between the NVRA and DPPA disappears, though, when comparing other voting-related laws and laws relating to the issuance of drivers' licenses and determination of voter eligibility under Pennsylvania law. Congress references citizens, eligible citizens, or citizenship in nearly every federal law related to voting or registration. Pennsylvania drivers' license laws, on the other hand, do not discriminate based on citizenship, while the Commonwealth requires voters to be citizens. Put simply, citizenship or immigration status are not points of information the Commonwealth requires the Department of Transportation to collect or maintain for the administration of driver licenses or motor vehicles, but rather that information is necessary to determine whether a prospective voter is eligible.

With respect to citizenship, Pennsylvania lists citizenship as a qualification to vote in the Commonwealth. 25 Pa. C.S. § 1301(a). Additionally, numerous federal laws enacted either pursuant to the Elections Clause or the Fifteenth Amendment contain references limiting the franchise, for purposes of federal elections, to eligible citizens. The Constitution provides, "The right of *citizens* of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV (emphasis added). The Voting Rights Act prohibits the imposition of any "voting qualification

or prerequisite to voting or standard, practice or procedure" the purpose of which would be to "den[y] or abridge[e] [] the right of any *citizen* of the United States to vote on account of race or color." Voting Rights Act of 1965, Pub. Law No. 89-110, 79 Stat. 437 § 2 (several other sections contain identical, or substantially the same language) (emphasis added). The Help America Vote Act (HAVA) requires mail voter registration forms to ask whether an applicant is a citizen of the United States and makes it a crime for anyone to "knowingly make[] a false statement with respect to naturalization, citizenry, or alien registry" when registering to vote. *See* Help America Vote Act, Pub. Law No. 107-252, 116 Stat. 1666 §§ 303(b)(4)(A)(i), 905 (2002). The NVRA is no different with Congress expressly stating its desire to "increase the number of eligible citizens," requiring DMVs to transmit sufficient information to allow election officials to "assess the eligibility of the applicant," including an attestation under penalty of perjury from the voter that he or she meets "each eligibility requirement (*including citizenship*)." NVRA, §§ 2(b), 5(c)(2)(B)-(C) (emphasis added).

Pennsylvania law and related regulations do not require the Commonwealth's Department of Transportation to collect citizenship or immigration related information. Instead, the Pennsylvania Legislature required the Department to issue a driver's license to all qualified applicants upon the payment of the required fee. 75 Pa.C.S. § 1510(a), *Perrotta v. Commonwealth*, 110 A.3d 255, 258-59 (Pa. Cmwlth

Ct. 2015). The only personal information the Legislature requires the Department to obtain and display on licenses are:

> a distinguishing number assigned by the department to the licensee, the actual name, date of birth, residence address, a color photograph or photographic facsimile of the licensee, such other information as may be required by the department, and either a facsimile of the signature of the licensee or a space upon which the licensee shall write his usual signature with pen and ink.

75 Pa.C.S. § 1510(a).

To assist with the initial determination of eligibility, the Department requires applicants to provide "name, address, date of birth, height, eye color, social security number and the original or certified copy" of one of a list of documents "verifying the applicant's date of birth and identity", such as a birth certificate, passport, certificate of United States Citizenship, or marriage record. 67 Pa. Code § 73.3. The Department has similar requirements when someone applies for a non-driver's license identification card, though adds to the list of acceptable documents items including baptismal and school certificates. *Id*. § 91.4(b).

Pennsylvania can issue licenses or identification cards to non-citizens without collecting immigration-related data. A non-citizen, for example, could provide an original birth certificate, marriage record, nonresident driver's license, or baptismal

certificate. It is not possible, though, for a non-citizen to register to vote. Pennsylvania limits the franchise to an individual "who will be at least 18 years of age on the day of the next election [and] who has been a citizen of the United States for at least one month prior to the next election" among other requirements. 25 Pa.C.S. § 1301(a). For registering through the driver's license application process, the Pennsylvania Legislature substantially duplicated the NVRA's language while delegating substantial authority to the Secretary of State and the Department of Transportation. *See id.* § 1323. The duplication includes requirements that the form include "notice that the applicant must be a citizen of the United States" with a registration declaration signed under penalty of perjury. *Id.* § 1327. The declaration language, again, is very similar to the NVRA. 52 U.S.C. § 20504(c)(2)(C).

The Statewide Uniform Registry of Electors (SURE) system contains a database of all registered electors in the Commonwealth and, among other things, must "preserve the power of the commissions to make determinations as to the qualifications of applicants." 25 Pa.C.S. § 1222. Since Pennsylvania limits the franchise to those who are both residents of the Commonwealth and citizens of the United States, it is reasonable to conclude that citizenship and immigration information is necessary to determine if an applicant is qualified.

The SURE system distinguishes between the sources of voter registration applications, requiring a designation of whether the applicant registered in person,

by mail, or through a driver's license application. 4 Pa. Code § 183.4(b)(8). Rather than laying out any specific information for applications submitted through the Department of Transportation, the regulations refer to applications submitted in accordance with 25 Pa.C.S. § 1323. Otherwise, the regulations simply require that the completed forms be submitted within the SURE system and adjudicated as the law provides, and records be retained. 4 Pa. Code § 183.12.

Neither Pennsylvania law nor regulations require the Department of Transportation to collect as part of the driver's license or photo identification process records related to citizenship or immigration. Pennsylvania law, though, does require the Secretary to collect records related to citizenship as part of the process for determining eligibility and, ostensibly, to effectively implement programs to ensure the accuracy and currency of voter registration records. It is reasonable to conclude, therefore, that any citizenship or immigration information collected by the Department of Transportation is to assist the Secretary of the Commonwealth or other election officials determining the eligibility of any voter registration applicant and is therefore a record that the Commonwealth must disclose to PILF pursuant to NVRA.

### III.    Congress Presumed DMVs Would Create Two Simultaneous Records For Driver's Licenses and Voter Registration Applications.

Not all individuals seeking a driver's license want to register to vote, just like not all individuals registering to vote want to renew or obtain a driver's license.

14

Recognizing this dichotomy, Congress enacted the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office … to protect the integrity of the electoral process; and to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012). As part of the process for ensuring accurate and current voter registration rolls are maintained, Congress requires election officials to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists *of eligible voters*." 52 U.S.C. § 20507(i)(1) (emphasis added).[3]

Through the NVRA, Congress intended for states to create two records simultaneously: a motor vehicle record for the DMV's use and a voter registration record for delivery to the appropriate election officials and their use in administering elections.[4] While the purpose was to minimize the information DMVs collected, Congress prescribed that the voter registration application "may not require any

---

[3] The NVRA requires states to "accept and use" a uniform federal voter registration form for federal elections. The current form does not require proof of citizenship, rather requiring "only that an applicant aver, under penalty of perjury, that he is a citizen." Deviations from this practice are unacceptable and preempted by the NVRA. *Arizona*, 570 U.S. at 4-5. There is a vast difference, though, between prohibiting states from requiring proof of citizenship to registering – accidentally or otherwise – those ineligible to participate in federal elections due to a lack of citizenship.
[4] Congress entitled 52 U.S.C. § 20504 "Simultaneous application for voter registration and application for motor vehicle driver's license." In (a)(1), the law states that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application."

information that duplicates information required in the driver's license portion of the form," but allowed the form to include information necessary to "prevent duplicate voter registrations; and enable State election officials to assess the eligibility of the applicant…." *Id*. § 20504(c)(2). As further proof Congress intended the creation of two separate, though similar, records, it required DMVs to transmit "a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority… to the appropriate State election official not later than 10 days after the date of acceptance." *Id*. § 20504(e)(1).

Once the information is transferred (by congressional mandate) to the state's election official for voter registration purposes, the information so transferred cannot be deemed a "motor vehicle record" subject to DPPA protection. The DPPA prohibits public disclosures by only "a State department of motor vehicles," 18 U.S.C. § 2721(a), not other state offices. *Cf. Davis v. Freedom of Information Comm'n*, 259 Conn. 45 (2001) (ruling the DPPA does not apply to state agencies other than the state DMV). And the voter registration information is not contained in a "motor vehicle record" pertaining to driver licenses or vehicle registrations. 18 U.S.C. § 2725(1) (defining "motor vehicle records" subject to the statute). The voter information is contained in a voter registration record in the possession of the election administration office and subject to the disclosure requirements of the NVRA.

The Constitution's Elections Clause permits the federal government, through the NVRA, to establish standards for receiving voter registration applications. *Arizona*, 570 U.S. at 12-13. The Elections Clause, though, does not provide the government the authority to preempt voting qualifications. This authority is left to state governments. "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government' by the Elections Clause." *Id*. at 17, *citing* The Federalist No. 60 (A. Hamilton) and 52 (J. Madison). Even the text of the NVRA supports this conclusion, as noted by Justice Scalia, as it "provides that the Federal Form 'may require only such identifying information … and other information … as is necessary to enable the appropriate State election official to assess the eligibility of the applicant." *Id.* at 18.

Because Congress lacks the authority to preempt voter qualifications, Pennsylvania is both free to limit the franchise to citizens and use its systems to help determine whether applicants meet those qualifications. *E.g.*, 25 Pa.C.S. §§ 1222, 1301(a). It may even use the motor vehicle application process to provide election officials with sufficient information to assess eligibility under state law.

Courts have opined several times on the extent to which § 20507(i)(1) permits inspection of voter registration records since the NVRA's enactment. When the question has come before them, the courts interpret the law liberally, making it clear that election officials must make available "'*all* records concerning the

implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of'" voter registration rolls. *Project Vote/Voting for Am.*, 682 F.3d at 336 (emphasis added); *see also Pub. Int. Legal Found. v. Dahlstrom*, No. 1:22-cv-00001-SLG, 2023 WL 3498044 (D. Alaska May 17, 2023) (NVRA requires disclosure of deceased and potentially deceased voters Alaska received from a third party, the Electronic Registration Information Center); *Pub. Int. Legal Found. v. Bellows*, No. 1:20-cv-00061-GZS, 2023 WL 2663827 (D. Me. Mar. 28, 2023) (NVRA preempts state law restricting disclosure of voter registration files and requires the production of voter registration records); *Pub. Int. Legal Found. v. Matthews*, 589 F.Supp.3d 932 (C.D. Ill. 2022) (NVRA preempts state law preventing voter registration list disclosure and requires state to comply with Plaintiff's request for records); *Ill. Conservative Union v. Illinois*, No. 20-C-5542, 2021 WL 2206159 (N.D. Ill. June 1, 2021) (NVRA should be construed liberally to require disclosure of records related to list maintenance, and accuracy programs); *Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425 (D. Md. 2019) (NVRA preempts state law limiting access to voter records to registered voters and requires the production of certain information); *Project Vote v. Kemp*, 208 F.Supp.3d 1320 (N.D. Ga. 2016) (ruling that the State must disclose records related to the cancelation, rejection, and pending status of applicants, including reasons why an applicant was rejected, cancelled, or otherwise not added to the voter rolls).

Very few courts have had the opportunity to opine on the extent to which the DPPA could frustrate the disclosure requirements of § 20507(i)(1). Only one such case, related to the instant one, appears to exist. In *Public Interest Legal Foundation v. Boockvar*, 431 F.Supp.3d 553 (M.D. Pa. 2019), a court, for the first time, limited the type of records the Secretary needed to disclose, preventing PILF from accessing certain Department of Transportation records related ostensibly to immigration designations applied to driver's licenses that transferred to the SURE system. As discussed above, though, this ruling appears to be in error as the law and regulations of Pennsylvania require citizenship and immigration designations for determining whether a voter registration applicant is qualified, not for driver's license or photo identification.

## IV.    The DPPA Protects Privacy In A Limited Set of "Motor Vehicle Records" And Does Not Countermand The NVRA's Disclosure Requirements For "Voter Registration" Records.

Congress enacted the DPPA "to protect the personal privacy and safety of licensed drivers consistent with the legitimate needs of business and government.'" A. Karras, THE CONSTITUTIONALITY OF THE DRIVER'S PRIVACY PROTECTION ACT: A FORK IN THE INFORMATION ACCESS ROAD, 52 *Fed. Comm. L. J.* 125 (1999); *see also Pichler v. UNITE*, 542 F.3d 380 (3d Cir. 2016). It fulfilled this purpose by restricting "States' ability to disclose a driver's personal information without the driver's consent." *Reno*, 528 U.S. at 143. Two factors motivated Congress to act: the murder

of actress Rebecca Shaeffer by a stalker and States receiving of significant revenue from the sale of information related to motor vehicle records.

As to the first factor, before the DPPA nearly anyone could obtain personal information from state DMVs from license plate numbers. *See Maracich v. Spears*, 570 U.S. 48, 57 (2013); *Senne v. Village of Palatine, Ill*, 695 F.3d 597, 607 (7th Cir. 2012) (Congress sought to remedy open access to DMV records, with Congress viewing it as "a public safety measure"); Electronic Privacy Information Center (EPIC), *The Drivers Privacy Protection Act (DPPA) and the Privacy of Your State Motor Vehicle Record,* available at https://epic.org/dppa/. The stalker obtained Ms. Shaeffer's home address "through a Tucson detective agency that procured the information from state motor vehicle records." Karras, THE CONSTITUTIONALITY OF THE DRIVER'S PRIVACY PROTECTION ACT at 128; *see also* P. Jacobs, *Addresses at DMV Remain Accessible: Privacy: New Rules Were Written to Keep Information Confidential. Critics Say There Are Too Many Loopholes*, L.A. TIMES (Aug. 19, 1991), available at https://www.latimes.com/archives/la-xpm-1991-08-19-mn-608-story.html.

As to the second factor, the sale of personal information generated revenue for state DMVs. One case cited by the *Reno* Court noted that Wisconsin received approximately $8 million selling data from the state DMV. *Reno*, 528 U.S. at 143-144 (*citing Travis v. Reno*, 163 F.3d 1000, 1002 (7th Cir. 1998)).

The DPPA survived a constitutional challenge in 2000 by South Carolina, alleging, among other things, that the DPPA violated the Tenth and Eleventh Amendments to the Constitution. *See id*. at 147-148; Karras, THE CONSTITUTIONAL OF THE DRIVER'S PRIVACY PROTECTION ACT at 128-129. A unanimous Supreme Court disagreed, concluding that the DPPA, since it regulated the sale of personal information through interstate commerce, was a proper exercise of congressional authority. *Reno*, 528 U.S. at 148.

In the DPPA, Congress created several exceptions to the rule against disclosure. Pertinent for this case are subsections (b)(1) and (b)(4), which allow disclosure for use:

> by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions, [and] in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

18 U.S.C. § 2721(b)(1), (4).

When examining permissible statutory disclosures, courts have analyzed both the original purpose for the DPPA and the text of the statute. For example, subsection (b)(4)'s litigation exception does not apply when a law firm submits a public records request for individuals who purchased vehicles from a specific dealer because the disclosure is for the purpose of soliciting business rather than conduct connected to

any existing lawsuit. *Maracich,* 570 U.S. at 61-62. Not only does the DPPA limit the use of motor vehicle records for solicitation, but one of the purposes for which Congress enacted DPPA was to curtail the use of the records for commercial purposes.

By contrast, the Court expansively read § 2721(b)(4) to allow near *carte blanche* disclosure of the records when a person is "acting in the capacity as an officer of the court, not as a commercial actor." *Maracich*, 570 U.S. at 63. Importantly, when a court orders disclosure, though, the DPPA still applies, regulating "the resale and redisclosure of drivers' personal information by private persons who have obtained that information from a state DMV." *Reno*, 528 U.S. at 146.

The trial court's interpretation and application of the DPPA in the NVRA context was mostly correct, though it erred in its prior *Boockvar* decision. The Court in *Boockvar*, while trying to balance the NVRA and DPPA, appears to have discounted various provisions of the NVRA limiting the franchise to eligible citizens and voters, specifically requiring applicants to attest to being citizens, and requiring the transmission of eligibility information with citizenship specifically identified, from the DMV to election officials. Further, the court did not address the various statutory exceptions in the DPPA permitting disclosure as part of a court order. *See Boockvar*, 431 F.Supp. at 563-64.

To exclude citizenship from disclosure, the *Boockvar* Court had to find, somehow, that they were motor vehicle records rather than the voter records subject to disclosure in 52 U.S.C. § 20507(i). This determination cuts against rules of statutory interpretation. If this Court agreed with the appellants/cross-appellees and the *Boockvar* Court, it would potentially place the Third Circuit at odds with the Fourth Circuit's holding in *Project Vote/Voting for Am.*, 682 F.3d at 336.

## CONCLUSION

Congress did not intend to create a contradictory statutory scheme when it passed the DPPA and NVRA in the same session. Instead, Congress adopted two harmonious statutes that distinguish between driver and vehicle records versus voter registration records. Courts should apply these statutes harmoniously by heeding Congress' intent to require DMVs to create two simultaneous sets of records, one subject to the disclosure requirements of the NVRA and the other subject to the privacy protections of the DPPA. A correct, harmonious application of these two statutes repudiates appellants/cross-appellees' effort to avoid disclosure of voter registration records under the DPPA.

///

///

///

Respectfully submitted,

November 13, 2023

/s/_____

Jonathon Paul Hauenschild
Lawyers Democracy Fund
4201 Wilson Blvd., Suite 110-315
Arlington, VA 22203
(202) 441-5487

*Counsel for Amicus Curiae*

## CERTIFICATE OF BAR MEMBERSHIP

I certify pursuant to Local Rule 46.1 that I am a member in good standing of

the bar of the United States Court of Appeals for the Third Circuit.


  /s/ Jonathon Paul Hauenschild


November 13, 2023

## CERTIFICATE OF COMPLIANCE AND VIRUS SCAN

I, Jonathon Paul Hauenschild, hereby certify as follows:

1.    The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because the brief has been prepared in proportionally spaced typeface using Microsoft Word 14 point Times New Roman font;

2.    The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 5,506 words, excluding those parts of the brief excluded by Fed. R. App. P. 32(f), as calculated using the word count function on Microsoft Word software;

3.    The text of the electronic and hard copies of this brief are identical; and

4.    A virus scan was run on the electronic copy of this brief using Trend Micro OfficeScan and no viruses were detected.

 /s/ Jonathon Paul Hauenschild

November 13, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2023, the foregoing brief was filed via CM/ECF. Service was accomplished on all parties or their counsel of record via CM/ECF.

 /s/ Jonathon Paul Hauenschild

November 13, 2023